# United States Court of Appeals

District of Columbia Circuit
E. Barrett Prettyman United States Courthouse
333 Constitution Avenue N.W.
Washington, D.C. 20001-2866

Mark J. Langer
Clerk

February 20, 2015

General Information
(202) 216-7000

Angela Caesar
U.S. District Court for the District of Columbia Circuit
(USDC)
333 Constitution Avenue, NW
E Barrett Prettyman US Courthouse
Room 1834
Washington, DC 20001-2866

Re:     14-1086 Jacksonville Urban League, Inc v. HHS

Dear Clerk of Court:

Pursuant to the order of this court filed February 20, 2015, a copy of which is enclosed, we are transmitting forthwith the court's docket sheet in electronic format.

Please acknowledge receipt of the transferred file by sending a confirmation email to dcnoa@cadc.uscourts.gov.

Sincerely yours,

BY:     /s/
Robert J. Cavello
Deputy Clerk

Enclosures

14-1086 Jacksonville Urban League, Inc v. HHS

### General Docket
### United States Court of Appeals for District of Columbia Circuit

| | |
|---|---|
| **Court of Appeals Docket #:** 14-1086 | **Docketed:** 05/23/2014 |
| Jacksonville Urban League, Inc v. HHS | **Termed:** 02/20/2015 |
| **Appeal From:** Department of Health & Human Services | |
| **Fee Status:** Fee Paid | |

**Case Type Information:**
  1) Petition for Review
  2) Review
  3)

**Originating Court Information:**
  **District:** HHS-1 : HHS-A-13-84

**Current Cases:**
  None

**Panel Assignment:**    Not available

14-1086 Jacksonville Urban League, Inc v. HHS

| | |
|---|---|
| Jacksonville Urban League, Inc.<br>            Petitioner | Earl M. Johnson, Jr., Esquire, Attorney<br>Direct: 904-356-5252<br>Email: Jaxlawfl@aol.com<br>[COR LD NTC Retained]<br>Law Office of Earl M. Johnson, Jr. LLC<br>3733 University Boulevard West<br>Jacksonville, FL 32257 |
| v. | |
| United States Department of Health and Human Services,<br>Departmental Appeals Board<br>            Respondent | Edward Himmelfarb<br>Email: edward.himmelfarb@usdoj.gov<br>[COR LD NTC Gvt Atty US DOJ]<br>U.S. Department of Justice<br>(DOJ) Civil Division, Appellate Staff<br>Firm: 202-514-2000<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>Barbara Cozad Biddle<br>Direct: 202-514-2541<br>Email: barbara.biddle@usdoj.gov<br>Fax: 202-307-2551<br>[COR NTC Gvt Atty US DOJ]<br>U.S. Department of Justice<br>(DOJ) Civil Division, Appellate Staff<br>Room 7517<br>Firm: 202-514-2000<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 |

14-1086 Jacksonville Urban League, Inc v. HHS

Jacksonville Urban League, Inc.,

            Petitioner

     v.

United States Department of Health and Human Services, Departmental Appeals Board,

            Respondent

14−1086 Jacksonville Urban League, Inc v. HHS

| 05/23/2014 | | PETITION FOR REVIEW CASE docketed. [14−1086] |
|---|---|---|
| 05/23/2014 | | PETITION FOR REVIEW filed [1495120] by Jacksonville Urban League, Inc. of a decision by federal agency [Service Date: 05/22/2014 ] Disclosure Statement: Not Attached; Certificate of Parties: Not Applicable to this Filing. [14−1086] |
| 05/29/2014 | | CERTIFIED COPY [1495123] of Petition for Review sent to respondent [1495120−2] [14−1086] |
| 05/29/2014 | | LETTER SENT [1495124] regarding attorney membership to Earl M. Johnson, Jr. for Jacksonville Urban League, Inc.. Application for Admission due 06/30/2014. [14−1086] |
| 05/29/2014 | | CLERK'S ORDER filed [1495126] directing party to file initial submissions: PETITIONER docketing statement due 06/30/2014. PETITIONER certificate as to parties, etc. due 06/30/2014. PETITIONER statement of issues due 06/30/2014. PETITIONER underlying decision due 06/30/2014. PETITIONER deferred appendix statement due 06/30/2014. PETITIONER procedural motions due 06/30/2014. PETITIONER payment of docketing fee due 06/30/2014. PETITIONER dispositive motions due 07/14/2014. Directing party to file initial submissions: RESPONDENT entry of appearance due 06/30/2014. RESPONDENT procedural motions due 06/30/2014. RESPONDENT certified index to record due 07/14/2014. RESPONDENT dispositive motions due 07/14/2014. [14−1086] |
| 06/23/2014 | | ENTRY OF APPEARANCE filed [1498974] by Edward Himmelfarb and co−counsel Barbara C. Biddle on behalf of Respondent HHS. [14−1086] (Himmelfarb, Edward) |
| 07/08/2014 | | UNOPPOSED MOTION filed [1501328] by HHS to extend time to file certified index [Service Date: 07/08/2014 ] Pages: 1−10. [14−1086] (Himmelfarb, Edward) |
| 07/14/2014 | | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES FILED [1502321] by HHS [Service Date: 07/14/2014 ] [14−1086] (Himmelfarb, Edward) |
| 07/14/2014 | | MOTION filed [1502322] by HHS to dismiss case for lack of jurisdiction (Response to Motion served by mail due on 07/28/2014) [Service Date: 07/14/2014 by US Mail] Pages: 1−10. [14−1086] (Himmelfarb, Edward) |
| 07/21/2014 | | CLERK'S ORDER filed [1503600] considering motion to extend time [1501328−2], suspending deadlines: ERES Certified Index Record [14−1086] |
| 08/21/2014 | | CLERK'S ORDER filed [1508637] to show cause regarding response to motion to dismiss case for lack of jurisdiction and failure to pay docketing fee [1502322−2]. Response to Order due 09/22/2014. Response may not exceed 20 pages; .Failure to respond shall result in dismissal of the case for lack of prosecution [14−1086] |
| 08/21/2014 | | FIRST CLASS MAIL SENT [1508646] of order [1508637−3] to petitioner [14−1086] |
| 08/21/2014 | | CERTIFIED MAIL SENT [1508647] with return receipt requested [Receipt No.70070710000471918516] of order [1508637−3]. Certified Mail Receipt due 09/22/2014 from Jacksonville Urban League, Inc.. [14−1086] |
| 09/02/2014 | | CERTIFIED MAIL RECEIPT [1510924] RECEIVED from Earl Johnson [signed for on 08/22/2014] for order [1508647−2] sent to Petitioner Jacksonville Urban League, Inc. [14−1086] |
| 09/22/2014 | | ENTRY OF APPEARANCE filed [1513523] by Earl M. Johnson Jr. on behalf of Petitioner Jacksonville Urban League, Inc.. [14−1086] (Johnson, Earl) |
| 09/22/2014 | | RESPONSE FILED [1513524] by Jacksonville Urban League, Inc. to order [1508637−3],[1508637−2] [Service Date: 09/22/2014 by CM/ECF NDA] Pages: 1−10. [14−1086] (Johnson, Earl) |
| 09/22/2014 | | CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES FILED [1513525] by |

14−1086 Jacksonville Urban League, Inc v. HHS

|  |  | Jacksonville Urban League, Inc. [Service Date: 09/22/2014 ] [14−1086] (Johnson, Earl) |
|---|---|---|
| 09/22/2014 | ☐ | DOCKETING STATEMENT FILED [1513526] by Jacksonville Urban League, Inc. [Service Date: 09/22/2014 ] [14−1086] (Johnson, Earl) |
| 09/22/2014 | ☐ | TRANSCRIPT STATUS REPORT [1513527] by Jacksonville Urban League, Inc. [Service Date: 09/22/2014 ]. Status of Transcripts: Final − No transcripts are needed for the appeal. [14−1086] (Johnson, Earl) |
| 10/03/2014 |  | NOTICE FILED [1515634] by Jacksonville Urban League, Inc. for payment of docketing fee. [Case Number 14−1086: Fee Paid] [Service Date: 09/30/2014 ] [14−1086] |
| 10/08/2014 | ☐ | UNOPPOSED MOTION filed [1516261] by Jacksonville Urban League, Inc. to transfer case [Service Date: 10/08/2014 ] Pages: 1−10. [14−1086] (Johnson, Earl) |
| 02/20/2015 | ☐ | PER CURIAM ORDER filed [1538688] discharging order to show cause [1508637−3]; granting motion to transfer case [1516261−2] and that this case be transferred to the United States District Court for the District of Columbia; dismissing motion to dismiss case for lack of jurisdiction as moot [1502322−2]. The Clerk is directed to transmit the original file of this case and a certified copy of this order to the United States District Court for the District of Columbia. Before Judges: Griffith, Kavanaugh and Ginsburg. [14−1086] |



UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT
333 Constitution Avenue, NW
Washington, DC 20001-2866
Phone: 202-216-7000 | Facsimile: 202-219-8530



JACKSONVILLE URBAN LEAGUE, INC.,

    Petitioner,

      v.                 Case No.:   1 4 - . . 6

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, DEPARTMENTMENTAL
APPEALS BOARD,

    Respondents.
_____/

### PETITION FOR REVIEW OF A FINAL DEPARTMENTAL APPEALS BOARD DECISION

**PLEASE TAKE NOTICE** this 22nd day of May, 2014, that Petitioner hereby petitions the

United States Court of Appeals for the District of Columbia Circuit for review of the Respondents'

final order, entered March 25, 2014, attached hereto at Ex. A.

                            Respectfully submitted,

                            **Law Office of Earl M. Johnson, Jr. LLC**

                            Earl M. Johnson, Jr., Esq.
                            Florida Bar Number 006040
                            Post Office Box 40091
                            Jacksonville, FL 32203
                            904.356.5252 (telephone)
                            904.394.3288 (facsimile)

### CERTIFICATE OF SERVICE

     I hereby certify that I have caused a true and correct copy of the foregoing to be served
upon: CHRISTINA BRADFIELD, ESQ., 61 Forsyth Street, SW, Suite 5M60, Atlanta, GA, this 22nd day of
May, 2014.

                          ATTORNEY

**Department of Health and Human Services**
**DEPARTMENTAL APPEALS BOARD**
**Appellate Division**

Jacksonville Urban League
Docket No. A-13-84
Decision No. 2565
March 25, 2014

## DECISION

The Jacksonville Urban League (JUL) appealed the June 14, 2013 determination by the
Administration for Children and Families (ACF) to continue to suspend funding for
JUL's Head Start and Early Head Start programs for more than 30 days. ACF previously
imposed a "summary suspension," that is, a suspension without prior notice or an
opportunity to show cause why the suspension should not be imposed. On appeal, JUL
argues that the summary suspension was improper because the grounds cited by ACF to
support its action did not constitute an emergency. JUL also argues that even if the
summary suspension was proper, it provided satisfactory evidence for rescinding the
suspension at a June 7, 2013, show cause meeting with ACF.

For the reasons explained below, we sustain the suspension. We conclude that the record
establishes a factual basis for ACF to determine that immediate suspension was necessary
because there was a serious risk to JUL Head Start participants' health and safety. We
further conclude that ACF reasonably determined to continue the suspension because
JUL did not provide satisfactory evidence at the show cause meeting that it had
adequately corrected each deficiency that led to the summary suspension and that the
deficiency would not recur.

## I.    Legal Background

Head Start is a national program to promote the school readiness of low-income children
by providing comprehensive developmental services to low-income preschool children,
including health, nutritional, educational, social, and other services. 42 U.S.C. § 9831;
57 Fed. Reg. 46,718 (Oct. 9, 1992). The Early Head Start program provides "low-income
pregnant women and families with children from birth to age 3 with family centered
services that facilitate child development, support parental roles, and promote self-
sufficiency." 45 C.F.R. § 1304.3(a)(8). The programs are administered at the federal
level by ACF, an operating division of the Department of Health and Human Services
(HHS). ACF provides financial assistance to Head Start grantees that operate the
program at the local level.

EX: A

2

Head Start grantees must comply with performance standards that address, among other things, administrative and financial management, required services, program operations, staffing, facilities, and transportation.  42 U.S.C. § 9836a; 45 C.F.R. Parts 1301, 1304, 1305, 1306.

The Head Start Act provides that the Secretary of HHS shall prescribe --

> procedures to assure that financial assistance under this subchapter shall not be suspended, except in emergency situations, unless the recipient agency has been given reasonable notice and opportunity to show cause why such action should not be taken; . . . .

42 U.S.C. § 9841(a) (2).  Section 1303.2 of the Head Start regulations defines "suspension" as a "temporary withdrawal of the grantee's authority to obligate grant funds pending corrective action by the grantee."  Section 1302.5(a) provides, "Except in emergency situations," ACF "will not suspend financial assistance . . . unless the grantee has been given an opportunity . . . to show cause why such action should not be taken."  Section 1303.12(a), in turn, authorizes ACF to issue a suspension "without prior notice and an opportunity to show cause if it" determines "that immediate suspension is necessary because of a serious risk . . .  (3) If staff or participants' health and safety are at risk."  A notice of summary suspension must advise the grantee "that it has an opportunity to show cause at an informal meeting why the suspension should be rescinded."  45 C.F.R. § 1303.12(c)(5).

Under section 1303.12(f), summary suspensions may not exceed 30 days unless certain conditions are met, including: "(1) The conditions creating the summary suspension have not been corrected,  . . . or (3) The grantee . . . requests an opportunity to show cause why the summary suspension should be rescinded."  If the grantee requests an opportunity to show cause, the suspension continues until the meeting has taken place "and a decision has been made by the responsible HHS official."  45 C.F.R. § 1303.12(h)(1).

ACF must "consider any timely material presented in writing, any material presented during the . . . informal meeting, as well as any other evidence that the grantee has adequately corrected the deficiency which led to the summary suspension."  45 C.F.R. § 1303.12(i).[1]  If ACF "concludes, after considering the information provided at the

---

[1]  The term "deficiency" is defined, in relevant part, as an "area or areas of performance in which an Early Head Start or Head Start grantee agency is not in compliance with State or Federal requirements, including but not limited to, the Head Start Act or one or more of the regulations under parts 1301, 1304, 1305, 1306, or 1308 of this title" and, as relevant here, involves a "threat to the health, safety, or civil rights of children or staff. . . ."  45 C.F.R. § 1304.3(a)(6)(i).

3

informal meeting, that the grantee has failed to show cause why the suspension should be rescinded," ACF "may continue the suspension, in whole or in part and under the terms and conditions specified in the notice of suspension." 45 C.F.R. § 1303.12(j).

Section 1303.12(n) provides that ACF may "modify the terms, conditions and nature of the summary suspension or rescind the suspension" if it receives "satisfactory evidence that the grantee has adequately corrected the deficiency which led to the suspension and that the deficiency will not occur again."

Generally, suspensions that remain in effect for more than 30 days are subject to section 1303.13. 45 C.F.R. § 1303.12(g). Section 1303.13(b) provides:

> After receiving concurrence from the Commissioner, [Administration on Children, Youth and Families], the responsible HHS official may suspend a grant for more than 30 days. A suspension may, among other bases, be imposed for the same reasons that justify termination of financial assistance or which justify a denial of refunding of a grant.

If ACF extends or issues a suspension for a period greater than 30 days, the grantee may (subject to certain exceptions) appeal the suspension to the Departmental Appeals Board. 45 C.F.R. §§ 1303.12(g), 1303.13.

## II.     Case Background

### A. The summary suspension and decision to continue the suspension

JUL ran a Head Start program for about 17 years and an Early Head Start program since 2010. JUL operated 24 centers in Duval County, Florida, at the time of suspension. ACF performed an on-site triennial review of JUL's program in 2012, issuing its report on September 9, 2012.[2] JUL was given 120 days to correct the areas of noncompliance found in the report. On January 8, 2013, JUL submitted a corrective action plan to ACF addressing the noncompliance findings. On March 20-21, 2013, the ACF Program Specialist assigned to JUL conducted a site visit.

---

[2] Under the Head Start Act, ACF conducts a review of each Head Start grantee at least once every three years. 42 U.S.C. § 9836a(c) (1) (A). If, as a result of a review, ACF finds a grantee to have one or more deficiencies, ACF requires the grantee to correct the deficiency immediately, or within 90 days, or by the date specified in a quality improvement plan. 42 U.S.C. § 9836a(e) (1) (B) and (e) (2) (A) (ii). If any other "noncompliance" is found and not timely corrected, the noncompliance then becomes a deficiency that must be timely corrected. 45 C.F.R. § 1304.61.

4

On April 5, 2013, ACF summarily suspended JUL's Head Start funding effective April 9, 2013 based on ACF's determination that immediate suspension was necessary because of a serious risk involving the participants' health and safety. JUL Ex. 1, at 2. (Notice of Summary Suspension) at 1-2. ACF specifically identified 15 incidents that occurred from January 2012 through March 2013 involving allegations that JUL staff failed to supervise and monitor children, used corporal punishment or isolation in violation of Head Start regulations, or failed to ensure that children were released from classrooms or buses to authorized adults. *Id.* at 2-3. ACF also stated that the Florida Department of Children and Families (DCF) had cited JUL "eight times for using physical discipline in the classroom, nine times for inadequate supervision, twelve times for poor repair and eight times for fences in disrepair." *Id.* at 3.

ACF appointed an interim grantee, the Community Development Institute (CDI), to operate the Head Start and Early Head Start programs during the suspension. At JUL's request, ACF held an informal meeting on June 7, 2013, for JUL to show cause why the suspension should be rescinded. On June 14, 2013, ACF issued a notice that it was continuing the suspension. JUL Ex. 2. ACF stated that JUL had not provided satisfactory evidence that the deficiencies that caused the summary suspension had been corrected and would not occur again. *Id.* ACF also indicated that after the suspension went into effect, CDI and ACF reviewers had identified additional concerns and conditions related to child health and safety. *Id.*[3]

### B. JUL's appeal and the issues presented

JUL appealed ACF's determination to continue the suspension, arguing, among other things, that the summary suspension was improper because ACF had not determined an "emergency" existed. At a pre-hearing conference, the parties agreed to the following framework of the issues for hearing:

---

[3] At the hearing, JUL elicited some admissions from CDI personnel that indicate that these concerns were based in part on inaccurate or misunderstood information from CDI. In particular, with respect to an allegation that children with identified health conditions lacked Individual Health Plans (IHPs), the CDI Health Content Specialist who led CDI's review of children's health records admitted that JUL's staff was using an acceptable form for follow-up plans for children with identified health problems, even if they did not call that form an IHP, as CDI did. Tr. at 275-277. As ACF points out, she did further testify that the CDI reviewers she led had identified some plans or records they considered to be "inconsistent" or "incomplete." Tr. at 259-269. At the hearing, however, it became clear that CDI staff (who did not begin that review of health records until at least April 30) had not documented their findings sufficiently to identify any specific way in which JUL failed to meet the requirements of section 1304.20(a)(1)(iv), the only regulation ACF timely identified as relevant to IHPs. Tr. at 269-273, 277-284, 304-305, 307, 335; ACF Exs. 17; ACF Ex. 82, at 2; *see also* Dec. 19, 2013 Rulings on Pre-hearing Matters at 17-23. The ACF team, moreover, "did not review any of the documents that were in the children's files." Tr. at 335. The evidence at the hearing also indicated that ACF may have been incorrectly attributing to JUL some conditions for which CDI had assumed control. The visits by ACF staff took place starting on May 20, 2012, about six weeks after CDI had taken over the program on April 9. ACF Exs. 83, 91, 73, 92; Tr. at 111, 325.

5

Whether to support the summary suspension, ACF had to determine that an "emergency" (under the definitions cited by JUL) existed, or only that a serious risk to participants' health and safety existed (as section 1303.12(a) provides);

Whether ACF had a factual basis for making the requisite determination and, if so, whether JUL provided satisfactory evidence to ACF at the June 7, 2013 show cause meeting that it had adequately corrected each deficiency that led to the April 9, 2013 summary suspension and that the deficiency will not occur again; and

Whether the additional conditions on which ACF relied in the June 14, 2013 letter to continue the suspension existed.

Aug. 12, 2013 Summary of Results of Telephone Conference, at 3.[4]

C. Pre-hearing rulings and hearing

The Board ruled on the threshold legal issue prior to the hearing. The Board concluded that 45 C.F.R. § 1303.12(a) interprets the term "emergency situation" in 42 U.S.C. § 9841(a)(2) by prescribing the conditions under which a summary suspension is authorized and prior notice to the grantee is not required. Those conditions include a situation in which there is a need for immediate suspension because of a "serious risk" to the health and safety of Head Start participants. The regulation, the Board wrote, reflects the reasonable judgment that immediate suspension may be required if there is a serious risk to the health and safety of Head Start children, and it is consistent with the plain meaning of the term "emergency," defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate action." Sept. 9, 2013 Ruling at 5 (attached to this decision), *quoting* Webster's Third New International Dictionary at 741 (1976 Ed. Unabridged).

Prior to the hearing, the Board also issued rulings denying ACF's motion to dismiss; rejecting JUL's objection to the issues statement in the Board's hearing notice; denying JUL's motion to strike ACF's brief; and denying ACF's motion for summary judgment.[5] The Board noted that it may not need to address the additional concerns cited in ACF's notice continuing the suspension if the Board decided that ACF had adequate bases for imposing the summary suspension and for determining that the suspension should be

---

[4] While the appeal of the suspension was pending before the Board, on August 20, 2013, ACF terminated JUL's designation as a Head Start grantee. JUL appealed the termination but subsequently filed a notice of voluntary dismissal of that appeal. Thus, this decision addresses only the suspension.

[5] ACF moved for summary judgment on the narrow issue of JUL's alleged failure to establish, develop, and implement follow-up plans for children under its care with observable, known or suspected health or developmental problems.

6

continued. Dec. 19, 2013 Rulings on Pre-hearing Matters at 14 (attached to this decision). Pursuant to sections 1303.16(c) and (d) of the regulations, the parties submitted documentary evidence and written direct testimony. The Board held an in-person hearing on January 7-9, 2014 for cross-examination and redirect examination. JUL cross-examined all five of ACF's witnesses. ACF cross-examined one of JUL's witnesses. On request by ACF, the Board permitted the parties to file post-hearing briefs.

## III.   Analysis

Below, we first discuss why we conclude that ACF had a factual basis for determining that immediate suspension was necessary because there was a serious risk to the health and safety of the participants in JUL's Head Start programs. We describe the evidence showing that in multiple instances, JUL failed to ensure that children were properly supervised or released only to authorized adults; JUL failed to ensure that its staff abided by Head Start standards requiring positive methods of child guidance and prohibiting corporal punishment; and JUL failed to meet facility maintenance requirements. We then explain why we conclude that the conditions that gave rise to JUL's supervision, transportation, child guidance, and facilities violations posed a serious risk to the health and safety of children enrolled in JUL's programs.

In the second part of our analysis we describe why we conclude that ACF reasonably determined that JUL did not provide satisfactory evidence at the show cause meeting that it had adequately corrected each deficiency that led to the summary suspension and that the deficiency would not occur again.

   A. <u>ACF had a factual basis for determining that immediate suspension was necessary because there was a serious risk to the health and safety of JUL Head Start participants.</u>

      1. *JUL failed to ensure that children were properly supervised and were not left alone or released to unauthorized adults.*

Section 1304.52(g)(5) of the Head Start regulations provides that staff "must supervise the outdoor and indoor play areas in such a way that children's safety can be easily monitored and ensured." Section 1304.52(i)(1)(iii) requires each Head Start grantee to ensure that its staff abides by the program's standards of conduct for making certain that "[n]o child will be left alone or unsupervised while under their care."

The Head Start transportation requirement at section 1310.10(g) provides that grantees "must ensure that children are only released to a parent or legal guardian, or other individual identified in writing by the parent or legal guardian." The regulation also

7

requires grantees to "maintain lists of the persons, including alternates in the case of emergency, and up-to-date child rosters . . . at all times to ensure that no child is left behind, either at the classroom or on the vehicle at the end of the route." *Id.*

The record evidence supports ACF's conclusion at the time of the summary suspension that in numerous instances, JUL failed to meet the Head Start supervision and transportation requirements and that the conditions that gave rise to these violations posed a serious risk to the health and safety of children enrolled in JUL's Head Start and Early Head Start programs.

Most notably, the evidence shows, and JUL has not disputed, that in the month preceding the summary suspension, there were two incidents wherein JUL staff left a child alone and unsupervised for an extended period of time. Specifically, on March 1, 2013, a three-year-old enrolled at the Northeast Springfield Center was left alone on a bus from approximately 8:15 a.m. to 2:28 p.m. without supervision, food, water, or bathroom facilities. ACF Exs. 10; 11, at 7-8. The DCF investigation report of the incident found that "the transportation log revealed that the child got on the bus at 7:40 a.m.," was marked absent from the class attendance logs and the daily meal count, and was found when the bus driver "went into the bus to get ready for the afternoon run." ACF Ex. 10, at 6. According to the DCF report, the driver told the investigator that when she returned to the bus in the afternoon, the bus door was not locked but she "observed that a stick was propped outside the door, keeping it closed." *Id.* at 7. DCF determined that the incident constituted a "Class I" violation of Florida licensing standards, that is, a violation that posed "an imminent threat to a child including abuse or neglect and which could or does result in death or serious harm to the health, safety or well-being of a child." ACF Ex. 10, at 1, 9; Fla. Admin. Code R. 65C-22.010(1)(d)(1).[6]

The evidence further shows, and JUL does not deny, that on March 18, 2013, JUL staff left a three-year-old alone on a locked playground at the Normandy Center during an extended day program. ACF Exs. 1, at 5-8; 11, at 7-8; 21. According to the DCF incident investigation report, the child had been taken outside with a group at approximately 3:15 p.m.; the others in the group left the playground between 4:50 and 5:00 p.m. ACF Ex. 1, at 7. The child apparently fell asleep in a tunnel in the play area, and when he woke up, he was by himself. *Id.* at 6. The child reported that he jumped

---

[6] In Florida, violations of the minimum health and safety standards are automatically classified as Class I, Class II, or Class III based on the severity of the violation. The definitions of the three classes are found in "Chapter 65C-22 Child Care Standards" of the Florida Administrative Code. Section 65C-22.010(1)(d) states that "Class I violations are the most serious in nature, pose an imminent threat to a child including abuse or neglect, and which could or does result in death or serious harm to the health, safety or well-being of a child." Class II violations are "less serious in nature than Class I violations, and could be anticipated to pose a threat to the health, safety or well-being of a child, although the threat is not imminent." *Id.*

8

over the fence and fell. *Id.* at 8. A janitor discovered the child "sitting down in front of the [locked] gate leading to the play area . . . with a torn shirt and his face was bruised." *Id.* at 6. DCF concluded that this supervision infraction was a Class I violation that "posed an imminent threat to a child, or could or did result in death or serious harm to the health safety or well-being of a child." *Id.* at 8.

In addition to the March 2013 incidents, the record shows that a multitude of violations of Head Start supervision and transportation requirements occurred in numerous JUL Head Start centers in the months preceding the suspension. Specifically, the record establishes that on December 14, 2012, a four-year-old from the Northeast Springfield Center was dropped off at a bus stop and left alone. ACF Exs. 9; 11, at 6; 10, at 9-10. According to the DCF interview of the child's parent, a "female Crossing Guard saw the child alone and went over to the child to ask about his parent's whereabouts." ACF Ex. 9, at 7. The DCF report of the incident stated that the child's parent reported that when she arrived to pick up the child after the bus had left, "her son was nearly in tears and she could see the fear in his face." *Id.*

A December 4, 2012 DCF investigation found that a teacher at the Normandy Center left two unauthorized adults (parents) in charge of a classroom of 20 children. ACF Exs. 8; 11, at 10. The teacher assistant was not in the room at the time. *Id.* DCF concluded that the infraction constituted a Class I violation of the licensing standards on supervision. ACF Ex. 8, at 6-7.

On November 14, 2012, the record establishes, a two-year-old child at JUL's Early Head Start Edward Waters College Center left a classroom unnoticed by adults and entered a bathroom unsupervised. ACF Ex. 7. The DCF investigation report of the incident stated that while the "violation [was] corrected the day of the incident," a video tape showed the child "leaving his classroom and going into a bathroom unattended and remaining there without . . . staff responsible for his supervision being aware." ACF Ex. 7, at 1.

DCF further found that another video taken on November 14, 2012 at the Edward Waters College Center shows staff violated supervision requirements by leaving a classroom with children completely unsupervised. ACF Ex. 7. DCF found that "both [employees] in the classroom were observed briefly leaving the classroom and the children unattended, which was anticipated as posing a threat to the health, safety or well-being of a child, but the threat was not imminent." *Id.* at 1.

9

On November 9, 2012, the evidence shows, a child from the Northeast Springfield Center was released at a bus stop to an unauthorized adult. ACF Exs. 6; 11, at 6; 10, at 9.[7] According to the DCF report of the incident, when the parent arrived at the bus stop at the "designated time" and found her child not there, she went to the center, where she was told that the child was dropped off at the "usual stop." ACF Ex. 6, at 5. During that exchange, another parent called the center to report that the child was dropped off along with her daughter and that she "took the child with her as there [was] nobody to pick-up the child." *Id.* at 6.

The Notice of Summary Suspension also cited an October 15, 2012 incident in which staff at the 8th Street Center did not adequately supervise a boy with a history of aggression who hit and scratched another child. JUL Ex. 1, at 3. The DCF investigation report of the incident shows that while the "violation was corrected at the time of the inspection as the girl was moved to another class room," DCF found that "the center was in violation of [the supervision] licensing standard." ACF Ex. 5, at 1, 4. According to the DCF's findings, the "center [was] aware of the aggressive nature of the child and they failed [to] take steps to prevent him from causing injury to [the skin on the forehead of] another child." *Id.* at 4.

A DCF investigation of an incident on March 6, 2012, found that a four-year-old enrolled at the Old Stanton Center was released from a bus and left unsupervised at the wrong location. ACF Exs. 3; 11, at 5. The DCF report of the incident further noted that the center "failed to complete an incident report timely" and "will be cited." ACF Ex. 3, at 5. The report noted that the parent of the child told the DCF investigator that this was "not the first time this particular driver has let a child off the bus when the parent was not present . . . [a]dding that she has called everyone including Children and Families and nothing was done with the driver." *Id.* at 7.

A DCF investigation report shows that on January 13, 2012, a bus driver and monitor who transported children from the Fairfield Center to the Old Stanton Center for an extended day program failed to follow correct bus log procedures and failed to conduct a physical inspection and visual sweep to ensure all children were off the bus. ACF Ex. 2. A four-year-old, who had fallen asleep, was left on the bus. During a classroom roll call, the child was discovered to be missing. The "transportation supervisor was contacted by the staff and the child was eventually brought back to Old Stanton." *Id.*

---

[7] The Notice of Summary Suspension and April 5, 2013 DCF Administrative Complaint date the incident November 14, 2012. The DCF investigation report shows that while the complaint was received on November 14, 2012, the incident occurred on November 9, 2012. ACF Ex. 6, at 4.

10

### 2. *JUL failed to ensure that its staff abided by standards requiring positive methods of child guidance and prohibiting corporal punishment.*

Under the Head Start child guidance and discipline requirements at section 1304.52(i)(1)(iv), a grantee must ensure that its staff "will use positive methods of child guidance and will not engage in corporal punishment, emotional or physical abuse" and that "they will not employ methods of discipline that involve isolation, the use of food as punishment or reward, or the denial of basic needs."

As noted above, ACF's decision to summarily suspend JUL stated that DCF had cited JUL eight times for using physical discipline in the classroom. The record evidence supports the conclusion that in the months preceding the summary suspension, there were multiple incidents involving staff failure to abide by the Head Start standards prohibiting corporal punishment. Specifically, the record shows:

- In December 2012, three children at JUL's Normandy Center reported that a teacher hit them, and a parent stated that she observed the same teacher pulling a child by the wrist. ACF Ex. 8, at 5. DCF found that the teacher used "inappropriate discipline" and cited the infraction as a Class II violation. *Id.* at 2, 5, 7-8.

- On November 14, 2012, "video surveillance" from the Edward Waters College Center showed that a staff member "grabbed a (2) two yr. old child by the arm and threw [the] child to the floor." ACF Ex. 7, at 6-7. The child was seen crying afterwards. *Id.* at 7. The DCF licensing investigation of the incident concluded that staff used "inappropriate discipline." *Id.* at 7. A DCF Child Protective Investigator report of the incident found that complaint allegations of actual physical injury, threatened harm and inadequate supervision were not substantiated but there was an "increase[d] . . .risk to the children at the daycare" and "credible evidence to support the maltreatment[,] inadequate supervision, physical injury, and threatened harm." JUL HT Ex. 7. According to the report, "[t]he disciplinary practices do present a risk to the children as the teacher was observed on video yanking the child aggressively by the arm and yanking him to the ground." *Id.*

- On November 15, 2012, a teacher at JUL's Northeast Springfield Center inappropriately disciplined a three-year-old child by lifting the child up by her arms and shoving her into a chair, dislocating the child's shoulder. ACF Ex. 12. An assistant teacher "observed that the child's arm looked limp and the child kept saying that her ar[m] 'really hurt.'" *Id.* at 5. The child's parent took

11

the child to a local hospital where she was treated and released. The DCF licensing incident investigation report shows that DCF found the incident to be a violation of the licensing standard relating to inappropriate discipline and imposed a civil penalty against JUL. *Id.* at 7-9.

- On May 17, 2012, a teacher at the Anders Park Center was cited for "push[ing] a child forcibly on the head" and not following JUL's written discipline policy. ACF Ex. 11, at 11-12; ACF Ex. 13.

- In April 2012, a JUL teacher isolated a child from the rest of his class, putting him in a chair in another room by himself as a form of punishment. ACF Ex. 11, at 11.

- On February 23, 2012, a staff member at the Edward Waters College Center witnessed another staff member hitting a child on the arm and bottom and a staff member grabbing a child by the arm firmly. ACF Exs. 14, at 5; 11, at 11-13.

- In January 2012, a staff member at JUL's Fairfield Center grabbed a four-year-old child's arm to discipline her. ACF Ex. 15. According to the documentation of the incident, the child cried and said that her arm hurt. *Id.* at 4. While DCF's investigation determined "there were not substantiated findings of physical injury," DCF concluded, "this manner of discipline to restrain the child is considered inappropriate, and therefore, constitutes a noncompliance with licensing standards." JUL HT Ex. 7.

  *3. DCF cited JUL for multiple facility maintenance violations.*

The Head Start requirements for physical environment at section 1304.53(a) include the following:

(7) Grantee and delegate agencies must provide for the maintenance, repair, safety, and security of all Early Head Start and Head Start facilities, materials and equipment. . . .
(10) Grantee and delegate agencies must conduct a safety inspection, at least annually, to ensure that each facility's space, light, ventilation, heat, and other physical arrangements are consistent with the health, safety and developmental needs of children. At a minimum, agencies must ensure that: . . .
(viii) Indoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions.

12

In the summary suspension notice, ACF advised JUL that the Office of Head Start had "learned of other incidents where JUL risked the health and safety of the children in its care." JUL Ex. 1, at 3. Among other things, ACF stated, DCF cited JUL 12 times for poor repair and eight times for fences in disrepair. JUL did not raise any dispute of fact about whether it was cited this often by DCF for poor repair or fences in disrepair (although, as we discuss below, it did argue that, in response to the triennial review, it had made required repairs and that it had a system for making repairs). JUL Br. at 7-9; *see also* ACF Ex. 84 (List of fines imposed by DCF for fences in disrepair and poor repairs).

### 4.  *Conditions in JUL's Head Start centers posed a serious risk to the health and safety of program participants.*

Applying the legal standard for summary suspension to the above-described incidents and evidence, we conclude that the multitude and gravity of JUL's violations of the Head Start supervision, transportation, child guidance, and physical environment requirements in the weeks and months preceding the summary suspension provided an ample factual basis for the summary suspension.

As we pointed out in our ruling on the threshold legal issue, the term "serious risk" in section 1303.12(a) of the Head Start regulations may refer to the severity of the potential harm, as well as to the likelihood of the harm occurring, and even a small risk of severe harm to a preschool child can reasonably be considered to require immediate corrective action. Sept. 9, 2013 Ruling at 5. The DCF investigation reports of JUL's November 9, 2012, December 14, 2012, March 1, 2013, and March 18, 2013 supervision and discipline infractions document that the incidents fell within the most serious class of violations -- posing "an imminent threat to a child, or [which] could or did result in death or serious harm to the health, safety or well-being of a child." ACF Exs. 1, at 5; 6, at 1; 9, at 1; 10, at 1. Indeed, given the circumstances of the March 2013 incidents -- that staff left a three-year-old child trapped on a bus alone for nearly six hours without food, water, or bathroom facilities and left another three-year-old child alone on a playground where he was able to climb over a locked fence and wander freely – it was fortuitous that more serious harm did not in fact occur.

Furthermore, the DCF investigations concluded that the January 13, 2012, October 15, 2012, and November 15, 2012 incidents also posed a threat to the health, safety and well-being of the children though, according to DCF, the threat was not "imminent." ACF Exs. 2, at 1; 5, at 1; 12, at 1, 7. DCF nevertheless found that in two of those incidents, actual physical harm occurred: JUL's failure to adequately supervise the boy involved in the October 2012, 8th Street Center incident resulted in actual physical injury to another child enrolled in the program; and a Northeast Springfield Center teacher's use of corporal punishment on November 15, 2012 resulted in a child sustaining a dislocated shoulder.

13

We also note that the disrepair of facilities and playgrounds mentioned in the summary suspension letter would increase the likelihood of harm to the children if they were left unsupervised, as well as the nature of the potential harm. Therefore, these citations are relevant to the determination of serious risk for this reason, as well as because they suggest that JUL may not have been paying sufficient attention to issues that independently impact on child health and safety. For example, even if JUL could not avoid some delay in making adequate repairs to playground fencing, it would be even more important for JUL to ensure staff understood the need to be vigilant in supervising the children, as well as to implement a system to make timely repairs.

In light of the number of JUL's infractions during the months leading up to the summary suspension and the gravity of many of JUL's supervision and discipline violations -- the most egregious of which took place in March 2013 -- we conclude that ACF had a sound factual basis for determining that immediate suspension was necessary because of the serious nature of the potential harm to the children enrolled in JUL's programs and because harm was likely to occur. The supervision and discipline violations occurred not in one or even a few of JUL's Head Start facilities, but in one-third of its centers, which shows that the conditions that led to the supervision and discipline failures were not isolated, but systemic. In our view, ACF could reasonably consider the threat of harm to be imminent. Thus, we conclude that, contrary to what JUL has repeatedly argued, the circumstances underlying ACF's summary suspension decision posed an emergency under any reasonable definition of that term.

### 5. JUL's arguments contesting the summary suspension are unpersuasive.

JUL argued at the show cause meeting and maintains on appeal to the Board that most of the violations cited in support of the summary suspension were irrelevant because they were "stale in time" and "cannot be considered in affording the Government a basis to act." JUL Memorandum of Law at 12; JUL Br. at 3, 17-18; JUL Reply at 4. Moreover, JUL contends, ACF's 2012 triennial review of JUL's Head Start programs and JUL's corrective action plan responding to the deficiencies cited in the report prove that conditions at JUL's facilities did not pose a serious threat to the health and safety of the children. JUL also asserts that post-suspension actions of the interim grantee, CDI, and a statement by a DCF official on May 20, 2013 "confirm that no emergency or serious risk existed at the time of the summary suspension." JUL Br. at 20-22; JUL Reply at 6-8.

We disagree with JUL that most of the incidents that occurred over the course of the 15-month period preceding the summary suspension were so remote in time as to be irrelevant. To the contrary, that infractions continued for more than a year -- and, as reflected in the March 2013 violations, posed an ongoing risk of severe harm to the children -- demonstrates that the conditions that gave rise to the violations had not been remedied and that whatever corrective measures JUL had taken were inadequate. JUL points to no provision in the Head Start Act or regulations (and we know of none) that

14

prohibits ACF from considering evidence of repeated incidents of noncompliance in the months leading up to an evaluation of whether conditions in a Head Start grantee's programs pose a serious risk to the health and safety of program participants. We also note that the enforcement provisions of the Florida child care licensing statutes provide that "[d]isciplinary sanctions for licensing violations that occur *within a two year period shall be progressively enforced.*" Fla. Admin. Code R. 65C-22.010(2)(e) (emphasis added). Indeed, under the Florida statutes, DCF initiated revocation of the Northeast Springfield Center's license after the March 1, 2013 incident because it was that center's third Class I violation within a two-year period. ACF Ex. 10, at 9.

At the in-person hearing, JUL suggested that the number of incidents cited to support the summary suspension was not significant in light of the large number of children served by JUL's programs. Tr. at 26. The ACF Monitoring Lead for Head Start Programs testified, however, that even taking into account the size of JUL's programs, "the number of [incidents was] . . . quite significant." Tr. at 372-73. According to the ACF official, what was important to understand was that "over time . . . this program . . . had similar findings over and over again," which shows that JUL had a "systemic issue . . . ." *Id.*

We also reject JUL's contention that ACF's 2012 triennial review of JUL's Head Start programs, which did not identify child supervision or discipline as areas of noncompliance, and JUL's corrective action plan addressing the areas of noncompliance that were identified, prove that conditions at JUL's centers did not pose a serious risk of harm to the children at the time of the summary suspension. The on-site triennial review took place from January 29, 2012 through February 3, 2012, prior to when most of the monitoring and discipline violations cited by ACF in support of the summary suspension occurred. JUL HT Ex. 3, at 1. In addition, the review included observations at only nine of JUL's 24 Head Start centers. *Id.* at 5. Thus, the absence of noncompliance findings in the triennial review report relating to supervising or disciplining children does not prove that as of April 5, 2013, when ACF decided to summarily suspended JUL, conditions at its Head Start and Early Head Start centers did not pose a serious risk to the health and safety of the children enrolled in its programs.

ACF asserts that another reason that the triennial review report did not address the supervision and discipline incidents was "[b]ecause JUL first reported the 2012 and 2013 incidents to ACF in mid-March, 2013." ACF Post-hearing Br. at 8. According to ACF, only after the ACF Program Specialist assigned to JUL learned of the incidents in March 2013, did she contact DCF, review DCF's database, and discover the multitude of prior violations and citations. *Id. citing* ACF Exs. 21, at 1; 93, at 1-2; Tr. at 46. While the Program Specialist testified that she was not informed of the earlier incidents by JUL until March 2013 and that her predecessor as program specialist had informed her of only one incident, it is not impossible that JUL had timely reported the incidents to other ACF representatives. Tr. at 61-66; 103-104. At the same time, JUL failed to provide any documentation to support its claim that it did timely notify ACF of the violations. Even

15

assuming that JUL had timely reported its 2012-2013 supervision and discipline violations to ACF, however, this would not have precluded ACF from determining that the seriousness of the March 2013 incidents, following the numerous earlier violations, showed that immediate suspension was necessary to protect the health and safety of the children.

While the triennial review was not a factor in ACF's decision to suspend JUL, we note that the review found, among other things, that JUL failed to "ensure its ongoing monitoring procedures identified facilities and equipment in need of repair or replacement to ensure children's safety." JUL HT Ex. 3, at 5. JUL's Head Start Director reported "the program's monitoring system was implemented through the use of a variety of forms and tools." *Id.* at 4. ACF's review of those forms found, however, that staff was not consistently using them and JUL "did not monitor its playgrounds to ensure maintenance issues were identified or verify repairs were completed, nor did it confirm children did not have access to peeling paint and broken equipment." *Id.* at 4. Because staff did not identify maintenance issues, the report concluded, "no repairs were initiated," and "facilities, materials, and equipment" in five of the nine centers observed (56 percent) "were not well maintained, in good repair or safe." *Id.* at 5. Like the DCF facility maintenance citations referenced in the summary suspension notice, these findings buttress ACF's case in that any failure by staff to supervise children playing on unsafe equipment or near other hazards would pose a heightened risk of harm.

JUL argues that it submitted its triennial review corrective action plan to ACF in January 2013, that it fully implemented all of the necessary corrections, and that during a "follow up program visit" on March 20-21, 2013, the Program Specialist indicated that JUL had successfully implemented the plan. JUL Br. at 11-14; JUL HT Ex. 4; Tr. at 23-24; JUL Ex. 26, at ¶¶ 5-6. The testimony establishes, however, that the Program Specialist was not responsible for conducting the formal review of the corrective action plan. Tr. at 40-44. The Program Specialist testified that her role was to assist the grantee with the corrective action plan, but program specialists have no authority to tell a grantee whether a plan is correct and approved. *Id.* The testimony further shows that her visit was a routine site visit, and the team responsible for assessing the sufficiency of the plan and verifying its implementation had not yet undertaken that review. Tr. at 40-43, 49-51, 87-88, 104. Moreover, JUL presented no documentation showing it implemented the corrective action plan, such as maintenance checklists and work orders completed after the triennial review showing repairs were made timely.

We also reject JUL's contention that a DCF official's May 20, 2013 statement -- that the facilities "are safe" and "the kids are going to be very, very, safe" – confirms that no emergency or serious risk existed at the time of the summary suspension. JUL HT Ex. 6. JUL's reliance on the statement is misplaced in light of the context in which it was made. After the summary suspension, CDI began to operate and assess the facilities and programs. ACF Ex. 56. During the start-up period, CDI's assessment team reported

16

"serious facility and personnel safety concerns," and on April 29, CDI requested that
ACF close the centers before the end of the school year "due to extreme health and safety
concerns." *Id.* On May 9, CDI and ACF jointly decided to close the facilities three
weeks ahead of schedule, on May 17, 2013. *Id.* Following "intense" negative reaction
from the community and "continuous" media coverage, ACF decided to reopen the
centers on May 22. *Id.* To ensure the children's safety through the end of the school
year, ACF brought on site an additional team of approximately 35 early childhood
education and health specialists to further assess facility conditions and safety, provide
technical assistance in classrooms, train staff, and assist with updating health plans. JUL
Ex. 2; ACF Exs. 40-52, 56, 72-75, 92. In addition, CDI hired 67 substitute teachers from
the Duval County School System to "ensure adequate child supervision" and "assist[] in
the classrooms for the three-week period when the schedule was resumed in order to
ensure safety in the classrooms." JUL Ex. 2; Tr. at 167. As discussed further below, CDI
also began to repair what it identified as "the most urgent health and safety" hazards at
the facilities. ACF Ex. 56; Tr. at 165. Thus the DCF official's statement about the
conditions of the centers when operations were resumed at the end of May is not
probative of the conditions that existed in early April, when ACF decided to summarily
suspend JUL.

We also find no merit in JUL's contention that CDI's use of the same facilities in which
JUL had run its programs and CDI's decision to hire former JUL employees prove that
there was no serious risk to the children's health and safety at the time of the summary
suspension. CDI's Lead Site Manager testified that when CDI assumed management of
the centers in early April, it found multiple problems with buildings and playgrounds and
made immediate repairs to address the "most urgent health and safety" concerns. ACF
Ex. 94, at 3; Tr. at 164-165, 187, 196; *see also* ACF Ex. 56. Those repairs included
"putting fencing up in playground areas that were facing onto parking lots or streets . . .
repairing leaks in the ceiling where rain was coming through [creating a breeding ground
for mold], . . . and repairing air conditioning units that were not functioning." Tr. at 164-
65, 187, 196; *see also* ACF Ex. 56, at 2 (CDI Summary of Activities and Discoveries
April 4, 2013 to May 30, 2013, "Immediate concerns were addressed including installing
fencing in play areas facing on streets and parking lots, repairs to leaking ceilings, broken
locks, etc."). Although JUL pointed out that the Lead Site Manager could not identify or
produce documentation of any specific renovations at the hearing, JUL's Facility
Supervisor acknowledged that several centers had roofs that leaked and that CDI had
installed new fencing at the New Stanton Center, and he did not deny that repairs of the
type the CDI witness described were made prior to May 22, 2013. JUL Post-hearing Br.
at 11; Tr. at 437-437-439, 500, 502.

With respect to staffing, the Lead Site Manager testified that CDI hired former JUL
employees who were legally eligible for employment "for continuity purposes." Tr. at
174. This practice was entirely consistent with the Head Start regulations, which provide
that in selecting a replacement agency, ACF must consider, among other things, the

17

"extent to which provision is made for continued employment by the applicant of the qualified personnel of the existing program." 45 C.F.R. § 1302.11. Furthermore, JUL points out that when JUL staff notified CDI that certain former JUL employees CDI intended to hire had been responsible for earlier infractions, CDI did not hire them. JUL Br. at 20.

Thus, contrary to JUL's claim, CDI's use of the same facilities and decision to hire former JUL employees do not show that at the time of the summary suspension no serious risk to the health and safety of the children existed. Rather, CDI's start-up activities show that CDI began to remediate what it viewed as the most serious building and playground hazards in April, and that technical support and additional staff was needed to address what CDI viewed as problematic teaching and transportation practices.

    B. <u>JUL did not provide satisfactory evidence at the show cause meeting that it had adequately corrected each deficiency that led to the summary suspension and that the deficiency would not occur again.</u>

To show cause for rescission of a summary suspension, a Head Start grantee must present "satisfactory evidence" that it "adequately corrected" each deficiency that led to the suspension and that the deficiency will not occur again. 45 C.F.R. § 1303.12(n); *The Connector (Making the Connection), Inc.,* DAB No. 2191 (2008).

JUL argues that it "presented substantial and satisfactory evidence" at the show cause meeting that "most of the allegations set forth in the April 5, 2013 Suspension Letter had been long ago remedied" and that "the 2013 allegations were either deemed unfounded by the Florida DCF or dealt with by disciplinary action, training, or revamped protocol." JUL Reply at 9. JUL stated that it "took assertive and/or corrective action to thoroughly investigate, discipline staff, reinforce training, or to determine the matter as unsubstantiated – all in accordance with its clearly defined policies and procedures." JUL Memorandum of Law at 12. JUL also characterized the suspension as based "on the acts . . . of individuals, most of whom JUL terminated or was in the process of terminating [at the time of the summary suspension], . . ." *Id.*; JUL Br. at 20.

On review of the argument, testimony, and documentation produced by JUL at the show cause meeting, we conclude that ACF reasonably determined that JUL did not present satisfactory evidence that JUL had adequately corrected all of the deficiencies underlying the summary suspension and that the deficiencies would not recur. At the show cause meeting, JUL presented a statement by its President and evidence showing that in response to the specific incidents wherein staff failed to supervise children or used corporal punishment, JUL conducted an investigation, identified "the culpable

18

individuals," and retrained, suspended, or terminated the individuals directly responsible for the violation. JUL HT Ex. 7; June 7, 2013 Meeting Transcript (Meeting Tr.) at 6; JUL Memorandum of Law at 16.[8]

We agree with ACF that the actions JUL took -- "disciplining staff members and documenting the cited incidents" -- were not sufficient "to ensure that JUL could properly supervise children" and that the same types of violations would not recur. JUL Ex. 2 (Notice of Continuation of Summary Suspension). Even if JUL could have reasonably assumed, after one or two incidents of staff failure to supervise, that such incidents would not recur because the employees who committed the violation were suspended and retrained, or fired, such an assumption surely was no longer reasonable once additional incidents involving supervision failures and leaving children at bus stops without authorized adults occurred. At that point (and certainly after the summary suspension), it was incumbent on JUL to thoroughly examine its operations to identify steps that could be taken to prevent such incidents in the future. JUL presented no evidence that its management staff undertook in response to the summary suspension to determine the underlying causes of the repeated violations, to examine the sufficiency of any training provided, or to identify additional system-wide measures to prevent such failures by any member of its staff in the future.

At the show cause meeting, JUL's President further stated that JUL provided "extensive employee training centered around safely transporting our children" and "established and implemented standards of conduct under which no child should be left unsupervised." Meeting Tr. at 8. He stated that JUL "periodically take[s] steps to reevaluate and strengthen our policies," noting that JUL had revised its Personnel Policy and Procedures Manual in March 2012, creating "a new subsection under child safety measures." Meeting Tr. at 8-9; JUL HT Ex. 2. The written policies, JUL explained on appeal to the Board, "are directed to" instructional, transportation, administrative and executive staff. JUL Br. at 7. JUL's President stated: "Each Head Start and Early Head Start employee" received a copy of the manual "during annual pre-service and in-service training." Meeting Tr. at 8-9. JUL produced at the show cause meeting its 2012 manual, its current

---

[8] JUL's Board Chair also made a statement at the show cause meeting. The Chair's statement principally described the organization's history, stature, and support in the Jacksonville community. JUL Ex. 3, at 14-19.

19

written policies, procedures and forms, and bus routes. JUL HT Ex. 2.[9] JUL also produced minutes of a March 14, 2013 Policy Council meeting showing the Council approved a revised policy on bus driver/monitor loading and unloading procedures and that in "February, an in-service training for new and current bus monitors was held at Normandy, Northeast Springfield, and Old Stanton centers." *Id.*

JUL's written policies and procedures do reflect Head Start performance standards. For example, the Child Safety Measures section of JUL's Policy and Procedures Manual states, "Leaving a child unattended while under the care and supervision of Head Start/Early Head Start is considered gross negligence," and this includes "the classroom; restroom; playground; cafeteria; [or] any agency vehicle." JUL HT Ex. 2. The manual further provides, "At no time should there be only one staff person left with the children," and if there is a need for a teacher to leave a classroom, "a second person must step in." *Id.* The manual "sets forth the policy forbidding the use of corporal punishment and total or extended isolation as disciplinary measures," and it lists the following as unacceptable forms of conduct: "Failure to use positive methods of child guidance and engaging in corporal punishment, emotional or physical abuse, or humiliation . . . isolation, the use of food as punishment or reward, or the denial of basic needs." *Id.*

Although JUL's written policies incorporate Head Start supervision, child discipline and transportation standards, JUL did not present satisfactory evidence at the show cause meeting that it successfully implemented those policies. For example, JUL did not provide copies of any training agendas, sign-in sheets or evaluation forms for any of its training programs even though its 2010-13 training and technical assistance plan indicates that such documentation would be kept. JUL Ex. 9. The plan does not specifically call for training to address the supervision and child guidance standards. *Id.* In addition, CDI's Lead Site Manager's report, adopted in her testimony, alleges that CDI found that 35 members of JUL's staff "were found ineligible to work in the program because they had not completed the 40 hours of early childhood training required by Florida licensing." ACF Exs. 56, 94. This finding undercuts JUL's general assertions about its staff training.

---

[9] In its appeal, JUL presented a declaration of its Vice President of Human Resources stating: "Annually there was staff continuous training on the supervision of children given by representatives from the [DCF]" and "[i]n 2012, JUL revisited its practices and revised its policies to ensure more stringent guidelines and procedures to ensure the safety of children." JUL Ex. 29, at ¶¶ 7-9. JUL also presented a March 2013 draft of its revised bus loading and unloading policy; a letter from JUL's Vice President for Early Education to DCF, referring to the policy; and an October 2012 revised policy on reporting protocols for incidents/accidents. JUL Exs, 6-7, 13. This evidence is similar to what JUL presented at the show cause meeting and, like that evidence, it does not show that JUL engaged in the comprehensive evaluation of its operations necessary to ensure that children would be supervised and not inappropriately disciplined.

20

Furthermore, JUL did not provide any evidence that it had evaluated its training programs to determine why, after it revised its written policies governing child safety in March 2012, and allegedly provided routine training to its staff on these policies, staff repeatedly failed in 2012 to supervise children in conformance with Head Start standards. Nor did JUL determine why, even after conducting additional training on bus loading and unloading procedures to the Northeast Springfield Center bus drivers and monitors in February 2013, staff left a child alone on a Northeast Springfield Center bus for the entire school day on March 1, 2013.

To ensure that each of a grantee's employees meet the critical standards that no child ever be left alone or unsupervised while under its care, the grantee must not only train its employees but also verify that they are carrying out their responsibilities under the standards of conduct. *Southern Delaware Center for Children and Families,* DAB No. 2073, at 29-30. Disciplining specific employees "who indisputably failed" to meet those standards and asserting staff previously had been provided with training does not show that the grantee was in compliance. *Id.* Rather, the grantee's "performance must be evaluated on the basis of how the organization as a whole is functioning and responding to the deficiency." *Id.* Moreover, the Board previously explained, it is not sufficient to adopt a code of conduct and train personnel on the code if the grantee does not have an effective system for monitoring and enforcing compliance with the code. *Id.* In this case, JUL presented evidence that it had an "Ongoing Monitoring Plan" (updated June 2006) that called for the use of assessment tools, including a "Classroom Monitoring Checklist" to evaluate teaching staff. In light of JUL's ongoing noncompliance with the supervision, transportation, and discipline standards, however, JUL needed to do more than show that it had these policies in place. Yet, JUL presented no evidence that it was, in fact, using the assessment tools and following up if the monitoring revealed a problem.

We also note that JUL mischaracterized many of the incidents cited by ACF in the summary suspension notice as having been "dismissed" or "not substantiated." For example, JUL stated in its Memorandum of Law at the show cause meeting that the three 2013 incidents cited in the summary suspension notice "were [d]ismissed." Memorandum of Law at 14. Contrary to this characterization, the DCF reports on the March 1 and March 18 incidents show that DCF determined both infractions constituted Class I supervision violations which posed "an imminent threat to a child including abuse or neglect, and which could or does result in death or serious harm to the health, safety or well-being of a child." ACF Exs. 1, 10, 11, 21. JUL also asserted that the DCF investigation into the November 15, 2012, incident (in which a teacher lifted up a child by her arms, shoved her into a chair, and dislocated the child's shoulder) "resulted in the allegations being deemed 'Not Substantiated.'" JUL Memorandum of Law at 17; JUL Br. at 12. The DCF licensing incident investigation report shows, however, that DCF found the incident to be a violation of the licensing standard relating to inappropriate discipline and imposed a civil money penalty against JUL. ACF Ex. 12, at 7-9. Furthermore, while in several cases the DCF concluded that an incident involving a

21

violation of Florida licensing standards was corrected with technical support, a determination under DCF licensing guidelines that a particular violation has been adequately addressed and resolved is not tantamount to a determination that the grantee is in compliance with the Head Start performance standards. As ACF's Program Specialist testified, DCF's regulations are different from ACF's, and many of the performance standards for a Head Start program differ or are more stringent than what states require for licensing. Tr. at 76. We therefore reject JUL's apparent attempt to minimize the gravity of its staff's supervision and child guidance failures.

In sum, we conclude that by viewing each supervision and child discipline violation in isolation, as attributable only to the acts of the individuals who were directly responsible for the infractions, JUL failed to identify the causes of its systemic problems -- whether in hiring practices, training, implementation of policies and programs, or oversight -- that led to the repeated incidents. Consequently, JUL did not implement adequate corrective measures to address those problems.

With respect to maintenance of the Head Start centers and playgrounds, JUL did present testimony that it had corrected the specific problems with building or playground maintenance identified in the triennial review and that it had a system for maintaining its facilities. JUL Ex. 26; JUL HT Ex. 2, at 102-125. Moreover, JUL's Facility Supervisor testified about his role in implementing that system. JUL Ex. 28; Tr. at 465-467. His testimony at the hearing undercut some testimony by ACF witnesses about their specific safety concerns. For example, an ACF witness testified about observing a front door to the R.L. Wilson Center that had broken, taped glass, but the Facility Supervisor testified that it was a type of safety glass that would not present a safety risk. ACF Ex. 49, at 1; Tr. at 337-340, 472-474.[10]

On the other hand, the Facility Supervisor admitted that some of the buildings were old and needed constant repairs and that some playground areas were difficult to maintain in a safe manner because of where they were located. JUL Ex. 28, at 2; Tr. at 389-393. While he testified that he and other JUL staff were completing maintenance reviews and that repairs were being timely made, JUL presented no relevant documentation to support this testimony (even though JUL's system called for documentation such as checklists and work orders), and he admitted that sometimes JUL had difficulty getting landlords to make repairs for which they were responsible. JUL HT Ex. 2; Tr. at 507-508, 530-534.

---

[10] ACF also argued that "[m]any of the centers had problems which can trigger an asthma attack, including mold . . . ." ACF Br. at 21. At the hearing, the CDI Lead Site Manager testified that CDI engaged two outside companies to perform lead and mold testing and that the testing for mold showed "no concerns." Tr. at 194-95. ACF proposed to enter into the record two additional exhibits (marked ACF Exhibits 99 and 100) to rebut the testimony of its own witness. We do not admit those exhibits into the record since ACF offered no good cause why they were not produced earlier.

22

Regardless of whether the repairs were being made relatively quickly, moreover, it is undisputed that some conditions could be created in the centers or on the playgrounds that were dangerous to children that would not be repaired immediately or would recur. For example, when leaks caused undermining of the subflooring in several places at the Northeast Springfield Center, the staff had to direct children to walk around the resulting soft spots. ACF Ex. 45, at 2; Tr. at 354, 440-447; ACF Ex. 92, at 4-5. Also, the playground fence at R.L. Wilson Center was repeatedly torn by neighbors in order to gain access. Tr. at 453, 522; ACF Ex. 58, at 1. The existence of conditions like these and the age or location of some of the facilities (which made creation of such conditions more likely) highlight the importance that JUL should have placed on ensuring that its staff were properly supervising the children. Yet, as discussed above, the evidence JUL presented at the show cause meeting was not satisfactory to show that JUL had corrected what ACF reasonably considered to be a systemic problem of lack of supervision and that incidents that endangered children's health and safety would not occur again.

ACF did also raise new concerns about JUL's operation of the programs, not mentioned in the notice of summary suspension. Given our analysis above, we need not address these concerns. *See* Dec. 19, 2013 Rulings on Pre-hearing Matters at 14.

**IV.   Conclusion**

For the reasons discussed above, we sustain ACF's decision to suspend funding for JUL's Head Start and Early Head Start programs.

Leslie A. Sussan

Constance B. Tobias

Judith A. Ballard
Presiding Board Member

**Department of Health and Human Services**
**DEPARTMENTAL APPEALS BOARD**
**Appellate Division**
Jacksonville Urban League
Docket No. A-13-84
September 9, 2013

## RULING ON THRESHOLD LEGAL ISSUE

This ruling addresses a threshold legal issue raised by the Jacksonville Urban League
(JUL) on appeal from a determination by the Administration for Children and Families
(ACF). ACF determined to continue to suspend funding for JUL's Head Start program
for more than 30 days, after ACF had initially imposed a "summary suspension" -- that
is, a suspension without prior notice and an opportunity to show cause. The issue
presented is whether, to support a summary suspension, ACF is required to make an
express finding that an "emergency" (under the definitions cited by JUL) exists.

For the reasons stated below, we conclude that, under the Head Start Act as interpreted in
the program regulations, ACF is authorized to suspend Head Start funding summarily
when it determines that immediate suspension is necessary because of a serious risk to
participants' health and safety.

**Background**

The Head Start Act, as amended, is at 42 U.S.C. §§ 9801 *et seq.* Head Start is a national
program providing comprehensive developmental services to preschool children,
including health, nutritional, educational, social, and other services. The program is
administered at the federal level by ACF, an operating division of the Department of
Health and Human Services. ACF provides financial assistance to Head Start grantees
that operate the program at the local level. JUL has been a Head Start grantee for about
17 years.

The Head Start Act provides that the Secretary of Health and Human Services shall
prescribe, among other things, for -

> (2) procedures to assure that financial assistance under this subchapter shall not
> be suspended, **except in emergency situations**, unless the recipient agency has
> been given reasonable notice and opportunity to show cause why such action
> should not be taken; . . .

2

42 U.S.C. § 9841(a) (2) (emphasis added).  Since 1979, the Head Start regulation at 45
C.F.R. § 1302.5(a) has provided:

> Except in emergency situations, the responsible HHS official will not suspend
> financial assistance under the Act unless the grantee has been given an
> opportunity, in accordance with part 1303, subpart D, of this chapter, to show
> cause why such action should not be taken.

In 1992, the Secretary amended the Head Start regulations in part 1303, subpart D, that
authorize a responsible program official, from ACF, to suspend a Head Start grantee's
financial assistance and specify when prior notice and an opportunity to show cause must
be given and when a "summary suspension" is permitted.  57 Fed. Reg. 59,260, 59,266
(Dec. 14, 1992); see 45 C.F.R. §§ 1303.11 (suspension on notice and opportunity to show
cause), 1303.12 (summary suspension and opportunity to show cause), 1303.13
(suspension continuing more than 30 days).  Section 1303.2 of the regulations defines
"suspension" as a "temporary withdrawal of the grantee's . . . authority to obligate
previously awarded grant funds pending corrective action by the grantee."

ACF first suspended JUL's Head Start funding on April 5, 2013 pursuant to section
1303.12(a) based on its finding that a situation existed in JUL's Head Start program that
presented a serious risk to the children's health and safety.  JUL Ex. 1 (Notice of
Summary Suspension) at 1-2.  Section 1303.12(a) authorizes ACF to issue a suspension–

> without prior notice . . . if it is determined that **immediate suspension is
> necessary** because of **serious risk of:**
>
> (1) Substantial injury to property or loss of project funds; or
> (2) Violation of a Federal, State, or local criminal statute; or
> (3) If staff or **participants' health and safety are at risk.**

(Emphasis added.)

After ACF had convened a show cause meeting, it issued a determination to continue the
suspension beyond the initial 30 days.

JUL appealed ACF's determination to this Board pursuant to 45 C.F.R. § 1303.13(f).
With its appeal, JUL submitted a legal memorandum arguing among other things that the
suspension was improper because ACF had violated the Head Start Act and regulations
by summarily suspending JUL's funding without having first determined that an
emergency situation existed or providing prior notice and an opportunity to show cause.
After acknowledging the appeal, the Presiding Board Member convened a telephone
conference to discuss procedures and JUL's request for an expedited hearing.  During
that teleconference, the parties agreed that ACF would first brief the threshold legal issue

3

JUL raised regarding the definition of "emergency," that JUL would be given an opportunity to reply, and that the Board would rule on this legal issue prior to conducting a hearing on the suspension. Aug. 12, 2010 Summary of Results of Telephone Conference, at 3.

**The Parties' Arguments**

In its legal memorandum, JUL argues that, in order to bypass the statutory and regulatory protections otherwise requiring notice and an opportunity to be heard prior to suspension of funding, "a bona fide emergency must exist." JUL Memorandum at 1. JUL argues that the Head Start Act and accompanying regulations "are framed to ensure that grantees are not stripped of their funding as a result of 'knee-jerk' reactions by the ACF." *Id.* at 9. JUL quotes, with added emphasis, the statutory wording referring to "procedures to assure that financial assistance under this subchapter *shall not be suspended, except in emergency situations*, unless the recipient agency has been given reasonable notice and an opportunity to show cause why such action should not be taken." *Id.* quoting 42 U.S.C. § 9841(a)(2)(italics added by JUL). JUL also cites to the Head Start regulation at 45 C.F.R. § 1302.5(a). *Id.*

According to JUL, the term "emergency" is not expressly defined in the Head Start Act or regulations, but "is well defined in multiple Federal Codes of Federal Regulations and Federal Acts," and "the common denominator is that the regulated subject matter faces *imminent* or *immediate* danger." *Id.* at 10 (emphasis in original). In support, JUL relies by "analogy" on various statutes and regulations governing other state or federal agencies. *Id.* Specifically, JUL cites the following:

- A Florida statute providing for the Department of Children and Families to take custody of a child when a law enforcement officer finds probable cause to believe a particular child is in "imminent danger." Fla. Stat. § 39.401(1)(b)(2011).
- A United States Department of Education regulation defining "emergency" as "a school facility condition that is so injurious or hazardous that it either poses an immediate threat to the health and safety of the facility's students and staff or can be reasonably expected to pose such a threat in the near future." 34 C.F.R. § 222.176.
- The Surface Mining Control and Reclamation Act, which JUL says defines emergency situations as "involving imminent danger to the health or safety of the public" or "imminent environmental harm." 30 U.S.C. §§ 1201-1328.
- The Atomic Energy Act, which JUL says "articulates boundaries to define emergency illustrating *imminent dangers* . . . ." 42 U.S.C. § 2168(a)(2).
- The Federal Aviation Act, which JUL says mandates notice and "opportunity to answer in cases of emergency . . . ." 49 U.S.C. 44709(e)(3).

4

JUL Memorandum at 10-11. JUL also refers to the Commodity Future Trading Commission Act, but without providing any citation to a definition of "emergency" or "emergency situation" or any quote referring to imminent or immediate danger. *Id.* at 11.

In response, ACF concedes that it may not suspend Head Start funding without prior notice, absent an emergency situation. ACF Br. at 1, 3, and 4. ACF states, however, that, in sections 1303.12 and 1303.11 of the regulations, the Secretary prescribed the procedures by which ACF "could suspend with or without prior notice." *Id.* at 4. Even though section 1303.12(a) does not use or define the term "emergency situation," ACF argues, that section nonetheless interprets that term. *Id.* ACF cites to the recent Supreme Court decision in *City of Arlington, Tex. v. F.C.C.,* _ U.S. _, 133 S. Ct. 1863, at 1868 (May 20, 2013), concluding that "the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*" (Italics in original.) According to ACF, the regulatory interpretation of the term "emergency situation" is clearly within the Secretary's authority under the statute because it "is simply common sense that a serious risk to the health and safety of young children, leaving them unsupervised, is an emergency." *Id.* ACF also cites various Board and court cases it says support its interpretation or require deference to that interpretation. *Id.* at 4-5.

JUL replies that, although ACF concedes that it cannot summarily suspend funding without prior notice, ACF does not "address the fact that the April 5, 2013 Summary Suspension letter failed to even mention that an emergency existed, or that section 1302.5(a) was overlooked by the ACF and not cited in the letter." JUL Reply Br. at 2d unnumbered page. "Rather," JUL argues, "without citing any legal authority, instead relying upon 'simply common sense'[,] ACF urges that the terms 'serious risk' and 'emergency' are synonymous," more specifically, that "a serious risk of risk equates to an emergency . . . ." *Id.* JUL concedes that a "governmental agency is afforded deference in interpreting its own regulations," but contends that the agency "still must follow the law." Here, JUL argues, "it is undisputed that the law requires an *emergency* to exist for the action taken by the ACF last April" and the "provisions of section 1303.12(a)(3) do not abrogate that prerequisite." *Id.*

### Analysis

As ACF argues, section 1303.12(a) interprets the term "emergency situation" in the Head Start Act. JUL is correct that the regulatory section is not framed as a definition of the term "emergency" or the term "emergency situation." That fact is irrelevant, however, since section 1303.12(a) is clearly intended to implement the statute by prescribing conditions for when a summary suspension is authorized and prior notice is not required. Thus, it constitutes the Secretary's interpretation of the term "emergency situation" to include a situation in which there is a need for immediate suspension because of a "serious risk" to the health and safety of Head Start participants. This conclusion is

5

buttressed by the facts that section 1302.5(a) (which does refer to an "emergency situation") cross-references the suspension procedures in part 1303, and that the stated purpose of part 1303 is to prescribe procedures based on 42 U.S.C. § 9841.  42 C.F.R. § 1303.1.  Since section 1303.12(a) interprets the term "emergency situation" and was cited in ACF's notice of summary suspension, the mere lack of any specific mention of the term "emergency" or citation to section 1302.5(a) in ACF's notice of summary suspension does not render that notice inadequate, as JUL suggests.

The regulatory interpretation of what Congress meant by "emergency situation" is, moreover, a reasonable interpretation, consistent with the statutory language and purpose.

First, the regulation is consistent with the plain meaning of the term "emergency," which one authority defines as "an unforeseen combination of circumstances or the resulting state that calls for immediate action."  Webster's Third New International Dictionary at 741 (1976 Ed. Unabridged).  The regulation requires a determination that immediate action is needed, and reflects the reasonable judgment that such action may be needed if there is a serious risk to the health and safety of Head Start children.  Such children are particularly dependent on others to protect them, given their young age.  This vulnerability is reflected in the Head Start performance standards, which contain numerous provisions addressing child health and safety.  *See, e.g.,* 45 C.F.R. § 1304.22.

Second, requiring that ACF limit summary suspension to situations where the risk has been determined to be "serious" is consistent with the intent of the provision in the Act to address due process concerns of the grantees.  Such concerns are outweighed by the need for immediate action to protect the children when a risk to their health and safety is serious.  While the term "serious risk" could refer to the severity of the potential harm, as well as to the likelihood of the harm occurring, even a small risk of severe harm to a preschool child can reasonably be considered as requiring immediate steps to prompt corrective action.

Neither party cites, and we did not find, any legislative history discussing the intent of the suspension provision referring to "emergency situation," which was enacted in 1981 by Public Law No. 97-35.  *See* H.R. Conf. Rep. No. 208, 97th Cong. 1st Session (1981), at 1126; S. Rep. No. 139, 97th Cong. 1st Session (1981), at 930.  We note, however, that the regulation at 45 C.F.R. § 1303.12(a) was promulgated in its current form in 1992, more than 20 years ago.  57 Fed. Reg. at 59,266.  The fact that Congress has not intervened,

6

despite making other changes to the Act in that 20-year period, supports the reasonableness of the regulatory construction of the statutory provision.* *Canada Packers, Limited v. Atchison, T. & S. F. Ry. Co.*, 385 U.S. 182 (1966).

JUL misplaces its reliance on the other statutes and regulations it cites. None of the cited language applies to Head Start suspensions or is from the Head Start Act. Moreover, use of terms such as "imminent danger" or "immediate threat" in some of the cited statutes or regulations does not mean that Congress used the term "emergency" in the Head Start Act to apply only to a situation in which a danger or threat is imminent. Indeed, some of the language JUL quotes or appears to rely on is itself specified in the statutory provisions setting conditions for exercise of state or federal authority, rather than as part of a definition of "emergency" or "emergency situation." Fla. Stat. § 39.401(1)(b)(2011); 30 U.S.C. §§ 1271(a)(2); 42 U.S.C. § 2168(a)(2). While the Department of Education regulation quoted by JUL does define the term "emergency," that definition includes a situation that would pose a threat "in the near future" as well as an "immediate threat." 34 C.F.R. § 222.176.

We also note that JUL does not explain in what sense the context and purpose of each cited reference is, in fact, analogous to suspension of Head Start funding. Review of the references indicates that they address state or federal actions that either arise in a wholly different context or have potential consequences different from an ACF action to summarily suspend a grantee's funding for no more than 30 days pursuant to section 1303.12(l).

Finally, we note that there is no issue here of whether JUL had notice of the Secretary's interpretation of the statute. That interpretation was evident on the face of the suspension regulations, which were promulgated using notice and comment rulemaking procedures.

---

* For example, the provision at 42 U.S.C. § 9841 of the Head Start Act was amended by Public Law No. 103-252, Title II of the Human Services Amendments of 1994, and by Public Law No. 110-134, § 16, but neither amendment provided a definition of "emergency" or "emergency situation" or took any other step to supersede the Secretary's regulation. Indeed, in 1998, Congress adopted the provision currently at 42 U.S.C. § 9836a(e) authorizing the Secretary to require a Head Start grantee to correct an identified deficiency "immediately if the Secretary finds that the deficiency threatens the health or safety of staff or program participants." Pub. L. No. 105-285, § 108; Pub. L. 110-134, § 8. This suggests that Congress was aware of the provision at 45 C.F.R. § 1303.12(a) since it uses almost the same language.

7

**Conclusion**

For the reasons stated above, we reject JUL's argument that ACF is required to find the existence of an "emergency" in the sense of an "imminent danger or threat" or to provide notice and an opportunity to show cause before it may suspend Head Start funding.

Instead, ACF is authorized to summarily suspend funding if it determines that immediate suspension is necessary because of a serious risk to participants' health and safety or because of one of the other serious risks specified in section 1303.12(a).


Leslie A. Sussan


Constance B. Tobias


Judith A. Ballard
Presiding Board Member

Department of Health and Human Services
DEPARTMENTAL APPEALS BOARD
Appellate Division

Jacksonville Urban League
Docket No. A-13-84
December 19, 2013

## RULINGS ON PRE-HEARING MATTERS

The Jacksonville Urban League (JUL) appealed a determination by the Administration
for Children and Families (ACF) to continue to suspend funding for JUL's Head Start
program for more than 30 days. ACF had initially imposed a "summary suspension" --
that is, a suspension without prior notice or an opportunity to show cause. On appeal,
JUL challenges the continuation of the suspension in part on the ground that the summary
suspension was unauthorized. After some intervening events, including a stay of the case
at the parties' request, and Board rulings on threshold issues, ACF submitted its response
brief and a motion for summary judgment. JUL replied, and both parties submitted
proposed written direct testimony. JUL also objected to the statement of the issues for
hearing and moved to strike ACF's brief.

For the reasons stated below, we conclude that JUL's objection to the issues statement
has no merit; we deny JUL's motion to strike ACF's brief (although we agree that brief
raises some new allegations outside the scope of the hearing); and we deny ACF's motion
for summary judgment on the suspension.

## I.    Background

The Head Start Act, as amended, is at 42 U.S.C. §§ 9801 *et seq*. Head Start is a national
program providing comprehensive developmental services to preschool children,
including health, nutritional, educational, social, and other services. 42 U.S.C. § 9831;
57 Fed. Reg. 46,718 (Oct. 9, 1992). The Head Start program serves primarily low-
income children, ages three to five, and their families. *Id.* The Early Head Start program
provides "low-income pregnant women and families with children from birth to age 3
with family centered services that facilitate child development, support parental roles,
and promote self-sufficiency." 45 C.F.R. § 1304.3(a)(8). The programs are administered
at the federal level by ACF, an operating division of the Department of Health and
Human Services (HHS). ACF provides financial assistance to Head Start grantees that
operate the program at the local level.

2

JUL has operated a Head Start program for about 17 years and an Early Head Start program since 2010, and had 25 facilities in the Jacksonville area at the time of suspension. ACF performed an on-site Triennial Review of JUL's program in 2012, issuing its report on September 9, 2012. JUL was given 120 days to correct the areas of noncompliance found in the report.[1] Before the 120 days was over, however, ACF suspended JUL's Head Start funding.

The Head Start Act provides that the Secretary of HHS shall prescribe, among other things, for --

> (2) procedures to assure that financial assistance under this subchapter shall not be suspended, **except in emergency situations,** unless the recipient agency has been given reasonable notice and opportunity to show cause why such action should not be taken; . . . .

42 U.S.C. § 9841(a) (2) (emphasis added). Since 1979, the Head Start regulation at 45 C.F.R. § 1302.5(a) has provided:

> Except in emergency situations, the responsible HHS official will not suspend financial assistance under the Act unless the grantee has been given an opportunity, in accordance with part 1303, subpart D, of this chapter, to show cause why such action should not be taken.

In 1992, the Secretary amended the Head Start regulations in part 1303, subpart D, that authorize a responsible program official, from ACF, to suspend a Head Start grantee's financial assistance and specify when prior notice and an opportunity to show cause must be given and when a "summary suspension" is permitted. 57 Fed. Reg. 59,260, 59,266 (Dec. 14, 1992); *see* 45 C.F.R. §§ 1303.11 (suspension on notice and opportunity to show cause), 1303.12 (summary suspension and opportunity to show cause), 1303.13 (suspension continuing more than 30 days). Section 1303.2 of the regulations defines "suspension" as a "temporary withdrawal of the grantee's . . . authority to obligate previously awarded grant funds pending corrective action by the grantee."

ACF first suspended JUL's Head Start funding on April 5, 2013 pursuant to section 1303.12(a), based on ACF's finding that a situation existed in JUL's Head Start program that presented a serious risk to the children's health and safety. JUL Ex. 1 (Notice of

---

[1] Under the Head Start Act, ACF conducts a review of each Head Start grantee at least once every three years. 42 U.S.C. § 9836a(c) (1) (A). If, as a result of a review, ACF finds a grantee to have a "deficiency," ACF requires the grantee to correct the deficiency immediately, or within 90 days, or by the date specified in a Quality Improvement Plan (not later than one year after the grantee received notice of the deficiency). 42 U.S.C. § 9836a(e) (1) (B) and (e) (2) (A) (ii). If any other "noncompliance" is found and not corrected pursuant to such a plan, the noncompliance then becomes a deficiency that must be timely corrected. 45 C.F.R. § 1304.61.

3

Summary Suspension) at 1-2. Section 1303.12(a) authorizes ACF to issue a suspension–
without prior notice . . . if it is determined that **immediate suspension is
necessary** because of **serious risk of:**

> (1) Substantial injury to property or loss of project funds; or
> (2) Violation of a Federal, State, or local criminal statute; or
> (3) If staff or **participants' health and safety are at risk.**

(Emphasis added.)

After ACF had convened a show cause meeting, it issued a determination to continue the
suspension beyond the initial 30 days.

JUL appealed ACF's determination to continue the suspension to this Board pursuant to
45 C.F.R. § 1303.13(f). With its appeal, JUL submitted a legal memorandum arguing
among other things that the suspension was improper because ACF had violated the Head
Start Act and regulations by summarily suspending JUL's funding without having first
determined that an emergency situation existed or providing prior notice and an
opportunity to show cause. In a telephone conference the Presiding Board Member
convened to discuss procedures, the parties agreed that ACF would first brief the
threshold legal issue JUL raised regarding the definition of "emergency," that JUL would
be given an opportunity to reply, and that the Board would rule on this legal issue prior to
conducting a hearing on the suspension. Aug. 12, 2013 Summary of Results of
Telephone Conference, at 3. The Board issued its ruling on the threshold legal issue on
September 9, 2013. In that ruling, the Board concluded that, under the Head Start Act as
interpreted in the program regulations, ACF is authorized to suspend Head Start funding
summarily when it determines that immediate suspension is necessary because of a
serious risk to participants' health and safety.

## II.     Relevant Head Start Requirements

Head Start grantees (including Early Head Start grantees) must comply with a range of
requirements related to administrative and fiscal management and the provision of high
quality services responsive to the needs of eligible children and their families. The Head
Start performance standards codified in 45 C.F.R. Part 1304 cover the entire range of
Head Start services and constitute the minimum requirements that a Head Start grantee
must meet.

ACF identified the following Head Start requirements as the basis for its actions: Head
Start Act section 641A(g)(3) and 45 C.F.R. §§ 1304.51(h)(1) (Reporting systems),
1304.52(i)(1)(iii)-(iv) (Standards of conduct), 1304.20(a)(1)(iv) (Determining child
health status), 1304.53(a)(7) (Head Start physical environment), 1304.53(a)(10)(viii)
(Head Start physical environment), and 1310.10(g) (Transportation requirements).

4

Section 1304.51(h)(1) of the regulations implements the monitoring requirements of section 641A(g)(3) of the Head Start Act (42 U.S.C. § 9836a(g)(3)) and requires that grantees:

> Generate periodic reports of financial status and program operations in order to control program quality, maintain program accountability, and advise governing bodies, policy groups, and staff of program progress[.]

A Head Start grantee must ensure that all staff, consultants, and volunteers adhere to the program's standards of conduct in section 1304.52(i)(1) of the regulations. Those standards include that "[n]o child will be left alone or unsupervised while under their care;" and that "[t]hey will use positive methods in child guidance and will not engage in corporal punishment, emotional or physical abuse, or humiliation."

In addition, a grantee must take timely steps to determine a child's health status and then, pursuant to section 1304(a)(1)(iv), "[d]evelop and implement a follow-up plan for any condition identified in 45 CFR 1304.20(a)(1)(ii) and (iii) so that any needed treatment has begun."

Requirements for physical environment at section 1304.53(a) include the following:

> (7) Grantee and delegate agencies must provide for the maintenance, repair, safety, and security of all Early Head Start and Head Start facilities, materials and equipment. . . .
> (10) Grantee and delegate agencies must conduct a safety inspection, at least annually, to ensure that each facility's space, light, ventilation, heat, and other physical arrangements are consistent with the health, safety and developmental needs of children. At a minimum, agencies must ensure that: . . .
> (viii) Indoor and outdoor premises are cleaned daily and kept free of undesirable and hazardous materials and conditions.

Transportation is addressed separately in 45 C.F.R. Part 1310. Section 1310.10(g) provides:

> Each agency must ensure that children are only released to a parent or legal guardian, or other individual identified in writing by the parent or legal guardian. This regulation applies when children are not transported and are picked up from the classroom, as well as when they are dropped off by a vehicle[.] Agencies must maintain lists of the persons, including alternates in the case of emergency, and up-to-date rosters must be maintained at all times to ensure that no child is left behind, either at the classroom or on the vehicle at the end of the route.

5

### III.  ACF's Summary Suspension Determination

ACF notified JUL by letter dated April 5, 2013 that it was summarily suspending all
federal financial assistance to JUL for its Head Start and Early Head Start programs as of
April 9, 2013 based on ACF's determination that immediate suspension was necessary
because of a serious risk to participants' health and safety.

The notice explained that ACF's action was based on information from various sources,
including ACF's regional office and the Florida Department of Children and Families
(DCF), as well as on information and evidence ACF gathered during an on-site
monitoring visit conducted on March 20-21, 2013.  ACF's April 5 notice summarized
ACF's factual findings.  ACF listed the following bullet points as showing that JUL
failed to ensure that children were not left alone or not left with unauthorized adults:

- On March 20, 2013 a Family Development Liaison at the Old Stanton Head Start
  Center was left alone to supervise 21 Head Start students who were not picked up
  at their bus stop during an early dismissal.
- On March 18, 2013 a child was left on [the] playground during extended-day Head
  Start program at the Normandy Center and was found by a janitor asleep in a play
  tube.
- On March 1, 2013 a child was left on a bus at the Northeast Springfield Center for
  the duration of the day without supervision, food, water, or bathroom facilities.
- On December 14, 2012 a child from Northeast Springfield Center was released at
  a bus stop to an unauthorized adult.
- On November 14, 2012 a child from Northeast Springfield Center was released at
  a bus stop to an unauthorized adult.

Notice of Summary Suspension at 2-3.  ACF also said that its regional office had learned
of the following incidents where JUL risked the health and safety of children in its care:

- On December 19, 2012 a child from Northeast Springfield Center sustained a
  dislocated shoulder from a teacher lifting her by her arms.
- Florida DCF has cited [JUL] eight times for using physical discipline in the
  classroom, nine times for inadequate supervision, twelve times for poor repair and
  eight times for fences in disrepair.

*Id.* at 3.  ACF also identified, from the Florida DCF Provider Database system, additional
"problems" with JUL staff occurring from January 2012 to December 4, 2012 and listed
those problems. *Id.*

6

## IV.    The Show Cause Meeting and ACF's Determination to Continue the Suspension

Under section 1303.12(f), a summary suspension may exceed 30 days only in certain circumstances, including: "(1) The conditions creating the summary suspension have not been corrected, or (2) The parties agree to a continuation of the summary suspension for an additional period of time." ACF may --

> modify the terms, conditions and nature of the summary suspension or rescind the suspension action at any time upon receiving satisfactory evidence that the grantee has adequately corrected the deficiency which led to the suspension and that the deficiency will not occur again.

45 C.F.R. § 1303.12(n).[2] ACF's Notice of Summary Suspension informed JUL that it had a right, under 45 C.FR. §§ 1303.12(c)(5) and 1303.12(d), to request an informal meeting to show cause why the suspension should be rescinded.

By agreement of the parties, the show cause meeting was held on June 7, 2013.  On June 14, 2013, ACF issued its Notice of Continuation of Summary Suspension.  ACF stated generally that "JUL has failed to show cause why the suspension should be rescinded" and that "JUL did not present satisfactory evidence that it had a system in place to ensure the appropriate supervision of children and it failed on numerous occasions to ensure children were supervised."  Notice of Continuation of Summary Suspension at 1.

In the Notice, ACF addressed JUL's argument that there was no emergency in April 2013 because JUL had disciplined the employees involved in the events giving rise to DCF's citations and documented the incidents, and, therefore, the problems were corrected. ACF disagreed that disciplining staff members and documenting the cited incidents were effective ways to ensure that JUL could properly supervise children.  ACF based this conclusion, in part, on observations it said were made by the Community Development Institute (CDI), an organization that ACF had chosen to act as interim grantee during the suspension.  Specifically, ACF stated:

> When CDI began operating as interim grantee, it found that former JUL staff did not understand the need to ensure that children were left with authorized adults.  In fact, CDI observed that there were not consistent drop off points, children were received by unidentified adults and there was no system for obtaining signatures when dropping children off.  There was confusion at the centers when the children were getting on and off the bus.

---

[2] Under section 1303.13, ACF may extend a suspension or issue a suspension for more than 30 days. Section 1303.13(b) provides that a "suspension may, among other bases, be imposed for the same reasons that justify termination of financial assistance or which justify a denial of refunding of a grant."

7

*Id.* at 3. ACF concluded that "JUL staff's poor training on child supervision at the time CDI became the interim grantee shows that JUL did not take the necessary action to correct this problem." *Id.* According to ACF, "JUL presented no evidence at the show cause meeting to show it made an attempt to implement training on supervision or that it could prevent the problem from recurring." *Id.*

ACF also addressed JUL's argument that, on each occasion beginning in March 2012 when JUL failed to supervise children, the state concluded that the problem was corrected with technical support. ACF responded that "JUL does not address the loss of its license at Northeast Springfield because of that Center's failure to supervise on three occasions" and that, regardless of what the state did, ACF could not ignore JUL's failure to prevent its staff from repeatedly leaving children unsupervised. ACF also noted that at an impromptu meeting between JUL's Board of Directors and ACF staff on April 8, 2013, Board members said that they did not know about the state citations. *Id.* at 4. Thus, ACF questioned whether JUL's governing bodies were being kept informed about the program.

ACF also asserted in the Notice that CDI and ACF had "discovered other dangerous conditions at JUL when CDI became the interim grantee," describing those conditions generally as follows:

> The facilities were in disrepair, there were infestations of mold, rats and insects, the learning environments were crowded, dirty, poorly lighted and children with serious health conditions had no Individual Health Care Plans.

*Id.* ACF found that "JUL did not operate in the interests of the children it served and this posed serious risks to the safety of children." *Id.*

Finally, ACF's Notice mentioned that the Memorandum of Law that JUL submitted during the show cause meeting discussed JUL's success in correcting compliance problems ACF found as a result of the Triennial review of JUL's program that ACF conducted in 2012. ACF clarified that the review report was not a factor in its decision to suspend JUL's funding. *Id.*

## V.   JUL's Appeal

If ACF extends or issues a suspension for a period greater than 30 days, the grantee may (subject to inapplicable exceptions) appeal the suspension to the Departmental Appeals Board. 45 C.F.R. § 1303.13(b). Under section 1303.13(f), the appeal "must be made within five days of the grantee's receipt of notice of suspension [and] must be in writing and it must fully set forth the grounds for appeal and be accompanied by all documentation that the grantee believes is relevant and supportive of its position."

8

ACF's Notice of Continuation of Summary Suspension informed JUL that it would have five days from receipt of the mailed copy of the Notice to file its appeal. ACF ultimately concurred that JUL had received the mailed copy on June 17, 2013, so it had until June 22, 2013 to comply with the appeal requirements.

In a letter to the Board dated June 19, 2013, JUL gave notice that was appealing ACF's determination, and requested a "scheduling conference." On June 21, JUL sent an email attaching the Memorandum of Law it filed with ACF and explaining that JUL had not yet received the official transcripts of the show cause meeting.

In light of the fact that JUL had not received the transcript by the time the appeal period had expired and the complexity of the case, the Presiding Board Member found that JUL had shown good cause for waiver of the section 1303.13(f) requirements and extended the time for JUL to complete its appeal submission. She also set a schedule for ACF's response brief and exhibits, submission of written direct testimony, and an oral hearing.

On July 25, 2013, JUL submitted its initial brief and further exhibits, and also identified its witnesses. JUL's brief stated:

> There are a number of material facts in dispute that relate to 1) whether an emergency existed at the time of summary suspension . . . ; 2) the allegations upon which [ACF] determined that "serious risks involving the health and safety of child . . . and staff" existed; 3) whether there was an "inability to supervise small children" . . . ; 4) whether "similar incidents" of serious risks of health and safety occurred in 2012; 5) whether [JUL's] staff "did not understand the need to ensure that children were left with authorized adults;" 6) whether there were consistent "drop off points" for children getting off the bus; 7) whether children were being "received by unidentified adults;" 8) whether there was "confusion at the centers when children were getting on and off the bus;" 9) whether [JUL's] staff had "poor training on child supervision;" 10) whether [JUL] presented no evidence at the Show Cause hearing that it "made an attempt to implement training on supervision or that it could prevent the problem from recurring;" 11) whether the procedures [JUL] "had in place did not work;" 12) whether [JUL] lost "its license at Northeast Springfield because of the center's failure to supervise on three occasions;" 13) whether [JUL] failed "to prevent its staff from repeatedly leaving children unsupervised;" 14) whether [JUL's] board of directors told "[ACF] staff that they did not know about the state citations;" 15) whether "facilities were in disrepair, there were infestations of mold, rats and insects infestations and raw sewage near buildings;" 16) whether the "learning environments were crowded, dirty, poorly lighted:" 17) whether children with serious health conditions did not have "Individualized Health Care Plans;" 18) whether [JUL] "did not operate in the interests of the children it served;" 19) whether [JUL's] facilities were deemed safe by the Florida [DCF] following an in depth inspection in May 2013; 20)

9

whether the Triennial Report and [JUL]s] subsequent Corrective Action Plan was a "factor in [ACF's] decision to suspend the funds;" 21) whether, just days before the summary suspension, [JUL's] board of directors was informed by [ACF's] assigned staff member that [JUL] had successfully implemented its Corrective Action Plan; 22) whether, prior to the suspension, [JUL] conducted one-to-one training sessions with staff, site visits, pre-service and in-service training, and top level executive meetings as late as April, 2013 – all regarding improved policy and strategy on child supervision and the staff's accountability for same; 23) whether [JUL] implemented an Instructional Strategies Continuum and small group instruction plans beginning in November 2012, that were interrupted by the suspension; 24) whether, following the summary suspension, [CDI] operated Head Start at the very facilities alleged to be unsafe; 25) whether the surrogate grantee actually rehired Head Start staff that had been suspended or terminated by [JUL] for their involvement with the very circumstances identified in the Summary Suspension Letter; 26) whether staff had not completed the necessary training; 27) whether [ACF] was not informed by [JUL] of state citations; 28) whether "there were substantial problems with most aspects of the JUL Head Start operations;" 29) whether "former JUL employees hired by CDI did not understand or follow transportation policies;" 30) whether [JUL's] "facilities need[ed] an estimated $1.3 million in repairs to restore them to safe conditions;" 31) whether CDI hired "approximately 35 early childhood, health and licensing specialists to provide technical assistance to update health plans and further assess facility conditions and safety;" 32) whether there was "several years' worth of dirt on floors and windows" at [JUL's] facilities; and 33) whether "Even if [ACF] gave JUL notice and an opportunity to show cause before suspending funding, JUL would not have been able to show that it satisfactorily dealt with the supervision problem."

JUL's Initial Br. at 7-9.

The Presiding Board Member later revised the schedule for the proceedings because of subsequent events, including ACF's termination action, the parties' negotiations, the federal government shutdown, and the need to rule on ACF's motion to dismiss, submitted after JUL withdrew its appeal of the termination action.  ACF ultimately submitted its brief and exhibits with its motion for summary judgment on December 2, 2013.  JUL submitted its objection on December 11, 2013, and its motion to strike and reply brief on December 12, 2013.  Both parties also submitted their written direct testimony.

Below we first address the issues for hearing since they frame our analyses of JUL's motion to strike and ACF's motion for summary judgment.  We then explain why we reject JUL's motion to strike and ACF's summary judgment motion.

10

## VI.   The Issues for Hearing and Ruling on JUL's Objection to Issue #3

### A.   The Notice of Hearing

The Board issued a Notice of Hearing on December 5, 2013, which stated that in the August 2, 2013 teleconference—

> the parties agreed to the following framework of the issues before the Board:
>
> 1.  Whether to support the summary suspension, ACF had to determine that an "emergency" (under the definitions cited by JUL) existed, or only that a serious risk to participants' health and safety existed (as section 1303.12(a) provides);
>
> 2.  Whether ACF had a factual basis for making the requisite determination and, if so, whether JUL provided satisfactory evidence to ACF at the June 7, 2013 show cause meeting that it had adequately corrected each deficiency that led to the April 9, 2013 summary suspension and that the deficiency will not occur again; and
>
> 3.  Whether the additional conditions on which ACF relied in the June 14, 2013 letter to continue the suspension existed.

### B.   JUL's Objection to Issue #3

On December 11, 2013, JUL submitted an objection to the Board's identification of Issue #3 as an issue for hearing.  According to JUL, it did not agree to this.  JUL argues:

> Throughout the proceedings . . . the JUL has maintained its position that the allegations raised for the first time in ACF's June 14, 2013 summary suspension continuation letter were 1) beyond the scope of the allegations contained in the April 5, 2013 summary suspension letter because those allegations were not in the summary suspension letter; and 2) beyond the scope of whether the JUL showed cause at the June 7, 2013 hearing to rescind the summary suspension, again because the new allegations contained in the June 14, 2013 summary suspension continuation letter were not made a part of the show cause hearing.

Objection at 1-2 (emphasis in original).  "To allow ACF to rely upon the new allegations contained in the June 14, 2013 summary suspension continuation letter, in order to defend the summary suspension on April 9, 2013 or to refute the JUL presentation at the June 7, 2013 show cause hearing," JUL argues, is "clear error" because the new allegations "were not known to JUL until its receipt of that letter, one (1) week after the actual Show Cause hearing."  *Id.* at 2.  According to JUL, the regulatory purpose of the show cause hearing was to respond to the allegations in the summary suspension notice, and JUL "was not required, and indeed unable, to anticipate and respond to the new

11

allegations of the June 14[,] 2013 letter , at the June 7, 2013 hearing." *Id.* JUL emphasizes that ACF presented no statements, testimony, or other evidence at the June 7, 2013 hearing. JUL asks the Board to "limit the evidence at bar to the allegations of the April 5, 2013 summary suspension letter, not including the new allegations of the June 14, 2013 letter – that [were] not known to JUL at the time of the June 7, 2013 Show Cause Hearing." *Id.* at 3.

For the reasons stated below, we conclude that JUL's objections are based on erroneous premises and its assertion that it raised these objections throughout the proceeding is belied by the record.

## C.   JUL's objections are based on erroneous premises

As discussed during the August 2, 2013 teleconference, including the additional conditions within the scope of the hearing does not mean that the Board will rely on them in evaluating the **summary** suspension. In deciding whether ACF had a factual basis for the summary suspension, the Board will look to the grounds on which ACF based that summary suspension.

JUL's description of the purpose of the show cause meeting it now gives in support of its objection to Issue #3 is too narrow, however. Under 45 C.F.R. §§ 1303.12(c)(5) and 1303.12(d), a grantee may request an informal meeting to show cause "why the suspension should be rescinded." Under section 1303.12(n), ACF may "rescind the suspension action at any time upon receiving satisfactory evidence that the grantee has adequately corrected the deficiency which led to the suspension **and that the deficiency will not occur again.**" (Emphasis added.) JUL clearly understood this as the purpose of the show cause meeting since the Memorandum of Law it submitted to ACF at that meeting cites the Board's decision in *The Connector (Making the Connection), Inc.*, DAB No. 2191 (2008). In that case, the Board concluded that, in order to prevail in its appeal of a continuation of a summary suspension, the grantee "would have to prove with respect to each of the independent grounds for suspension of the grant award (1) that the conditions on which ACF originally relied did not exist; or (2) that those conditions did not pose a serious risk of loss of project funds or to the health and safety of staff or participants (section 1302.12(a)); or that (3) the [grantee] had provided to ACF . . . 'satisfactory evidence' that it had 'adequately corrected [each] deficiency which led to the suspension and that the deficiency will not occur again' (section 1303.12(n))."[3] Thus,

---

[3] Section 1303.12(f) provides that the effective period of a suspension of financial assistance "may not exceed 30 days" unless "[t]he conditions creating the summary suspension have not been corrected" or one of the other specified circumstances exists. Section 1303.12(n), however, effectively interprets section 1303.12(f) as meaning that ACF may determine that the conditions creating the summary suspension (such as a serious threat to participants' health and safety) have not been corrected (and therefore the suspension may continue) if the evidence is not satisfactory to show that the deficiency that led to the suspension will not occur again.

12

JUL had timely notice that, in determining whether to rescind the suspension, ACF would be considering whether the evidence was satisfactory to show that the deficiency that led to the suspension would not occur again.

We also note that the Summary Suspension Notice did mention that Florida DCF had cited JUL "twelve times for poor repair and eight times for fences in disrepair." Notice of Summary Suspension at 3. Thus, while the later notice continuing the suspension mentions ACF's finding that the facilities were in disrepair as though that was a new concern, poor facility maintenance was a factor in the Summary Suspension as well, as JUL recognized. JUL's Memorandum of Law that it submitted at the show cause meeting (at page 22) asserted, among the reasons why JUL thought the suspension should be rescinded, that "JUL has maintained a safe facility for its participants."

### D.    JUL did not raise these objections throughout the proceeding

Contrary to what JUL now asserts, it has not throughout its appeal raised the objections it now raises. As noted above, under section 1303.13(f), JUL's appeal was to "fully set forth the grounds for appeal and be accompanied by all documentation that the grantee believes is relevant and supportive of its position." In support of JUL's request for a waiver of these requirements, JUL cited as a basis for waiver that—

> [ACF's] Notice of Continuation of Summary Suspension letter, dated June 14, 2013, consists of a series of new allegations, not raised in the summary suspension letter and not previously addressed in any manner by [ACF]. Many of the new allegations concerned the maintenance of facilities. The ability to defend and respond to the new allegations alone requires additional time . . . .

"Points of Clarification Regarding July 16, 2013 Teleconference" at 3. Thus, at the outset of its appeal, JUL sought to address whether the additional conditions on which ACF relied in the June 14, 2013 letter to continue the suspension existed.

In its initial brief at page 4, JUL challenged the reliability and merits of what JUL calls "new concerns" regarding JUL's facilities, but did not argue that these concerns should not be part of the suspension proceedings.[4]

---

[4] Nothing in the regulations specifically precludes ACF from considering relevant evidence from any source in determining whether to continue a suspension (although JUL has raised procedural concerns regarding whether JUL had adequate notice and opportunity to comment on the evidence from other sources on which ACF relied). We note, however, that the notice continuing the suspension refers not only to information provided by CDI, but also to the fact that ACF's Office of Head Start (OHS) "brought in large teams . . . to provide technical assistance, to update health plans and further assess facility conditions and safety" and that "OHS discovered deplorable conditions at many of the JUL centers." Some of the new concerns described in the "BACKGROUND" section of that notice are also listed generally as reasons for continuing the suspension in the "OHS' FINDINGS" part of the notice. The notice informed JUL that, if it had any questions concerning the action, JUL should contact

13

On the other hand, JUL's list of material facts in dispute at pages 7-9 of the initial brief (quoted on pages 8-9 above) includes disputes concerning alleged facts related to the additional, new concerns that ACF gave as a reason for continuing the suspension, such as whether children with serious health conditions did not have individualized health care plans (IHPs) and whether the learning environments were crowded, dirty, and poorly lighted.

The only other reference to the "new allegations" in JUL's initial brief is at page 28, where JUL stated:

> Of course, JUL has been hamstrung in its ability to oversee, investigate, or resolve any [of] the new allegations of the June 14, 2013 Continuation Letter because it has not been managing Jacksonville Head Start since the April 2013 Summary Suspension. This procedural quagmire reinforces the logic of federal law mandating that [JUL] should have been given notice and an opportunity to be heard and to cure. Even so, [JUL] showed cause at the June 7, 2013 hearing and [ACF] presented no evidence.

While this arguably raises an issue of the procedural fairness of ACF's reliance on the new concerns, it cannot reasonably be read in context as an assertion that the factual issues underlying those concerns should not be addressed at the hearing.

Contrary to what JUL now argues, moreover, the Board's Summary of Results of Telephone Conference, which was dated August 12, 2013 but summarized the results of the August 2 teleconference, correctly stated the parties' agreement regarding the issues. The Board has reviewed the recording of the August 2 teleconference. As the summary noted, one purpose of that teleconference was to discuss whether the issues for hearing could be narrowed. The Presiding Board Member called to the parties' attention the need for the Board to give advance notice of the issues for hearing and the requirements on which ACF was relying, among other things. In the course of that discussion, JUL did raise some concerns about the wording of the third issue, in response to which the Presiding Board Member reframed the issue. Thereafter, JUL's counsel expressed concern solely with respect to whether the additional conditions could be considered grounds for the summary suspension. The Presiding Board Member noted that the parties could address any legal points with respect to such matters in their opening statements or post-hearing briefs.

---

the OHS Regional Program Manager. ACF's July 9, 2013 Notice of Deficiency Requiring Immediate Correction provided more detail concerning the ACF findings, which it said were based on an off-site review on April 16 and an on-site review ACF conducted in May 2013. JUL had received that notice and the accompanying report before the August 2, 2013 conference. JUL did not in the conference seek any discovery from ACF regarding its findings.

14

More importantly, at the end of the document summarizing the results of the teleconference, the Board said:

> **If you believe that there are any errors in this summary . . . , please notify the Board immediately by sending an email to [the email address of the assigned Board attorney], copied to opposing counsel.**

(Bold in original.) JUL did not then notify the Board that it believed that the summary contained an error regarding the issues to which the parties had agreed. Nor did JUL object to the list of requirements that ACF alleged JUL had violated although that list included requirements related to the additional conditions raised in the notice continuing the suspension.

We note that the Board has not yet decided whether any of the additional, new concerns ACF identified in that notice as reasons why it would not rescind the suspension are material to the Board's decision making in this case. The Board may not need to reach any issues regarding those concerns if the Board decides that ACF had adequate bases for imposing the summary suspension and for determining that the suspension should be continued, without having to rely on the additional concerns. But the Board nonetheless may reasonably include those additional concerns as part of the hearing, so that the Board will have a fully developed record if it decides that those concerns are relevant to its decision making. *See* 45 C.F.R. § 16.9.

Accordingly, we conclude that JUL's objection to Issue #3 has no merit.

## VII.   JUL's Motion to Strike

As noted, JUL moved to strike ACF's answer brief and to proceed to final hearing. JUL argues that, throughout its brief, ACF makes entirely new allegations. JUL gives some examples of those new allegations, including assertions about "used condoms," "gang activity," "gun shells," and "a pit bull," that it says were not part of the "deficiencies identified in the April 5, 2013 Suspension Letter or even the June 14, 2013 continuation letter." Motion to Strike at 2. JUL says ACF "utilizes statements by its 'team' it brought to Jacksonville long after the June 7, 2013 suspension hearing." *Id.* JUL also says that ACF's allegations regarding follow-up health plans "are well beyond the scope of the June 7, 2013 hearing or June 14, 2013 continuation letter, citing dates of 'July 8, 2013'" and 'August 7, 2013.'" *Id.*

By email on December 17, 2013, ACF responded, opposing JUL's motion to strike. ACF argues that it has not raised new issues in its brief and that JUL had timely notice of the findings that JUL describes as new through the review that ACF conducted in May to early June 2013 and through the identification of the issues in the August 2 teleconference and the Board's summary of the results of that conference.

15

We agree with JUL that ACF's brief does raise some allegations that go beyond the reasons ACF's notice letters gave as bases for the summary suspension and for continuing the suspension. Under the Head Start regulations, ACF's notice of summary suspension was to include the "grounds for the suspension," and its notice continuing the suspension was to state the "reasons for the action." 45 C.F.R. §§ 1303.12(c)(2), 1303.13(c)(1). Although ACF sought in the August 2 teleconference to add new issues such as one relating to medication administration, it, too, ultimately agreed to the narrower statement of the issues included in the Board's summary of the results of that teleconference. ACF does not explain how that statement of the issues encompasses any additional matters beyond those stated in the notices. Issue #3 encompasses only "the additional conditions on which ACF relied in the June 14, 2013 letter to continue the suspension." Moreover, ACF does not explain how the mere fact that the additional findings are from the review conducted from May to early June (which was after CDI took over the program) establishes that JUL had timely notice of the findings, much less that JUL had notice that its appeal had to address findings other than those ACF identified in the June 14 letter as the reasons for its action.

We do not agree with everything JUL says in its motion, however. First, ACF did cite in the continuation letter to a lack of IHPs for children with serious and chronic health conditions and, in the August 2 teleconference, ACF identified section 1304.20(a)(1)(iv) (which requires follow-up plans) as the requirement it alleges that JUL violated by not having IHPs.

In addition, JUL cites to nothing establishing that ACF brought its "team" to Jacksonville "long after" the June 7 show cause meeting. The continuation notice referred to the site visit by an OHS team, and ACF's brief and exhibits show that the OHS "sent a team of approximately thirty-five early childhood, health and licensing specialists" to evaluate JUL's facilities and programs in May through early June, before the show cause meeting,. ACF Br. at 7; ACF Exs. 29-52, 56, at 3. Moreover, ACF's brief refers to the dates July 8, 2013 and August 7, 2013 with respect to the lack of IHPs because those are the dates of ACF's Notice of a Deficiency Requiring Immediate Correction resulting from the May-June 2013 visit and of JUL's CAP submitted in response to that notice, respectively. ACF Br. at 14-15. ACF's brief relies on these documents primarily to show that JUL admitted that it did not have IHPs for children with serious health conditions. To the extent ACF's brief makes new allegations based on those documents, however, the Board agrees that ACF's brief goes beyond the scope of the issues for hearing.

Contrary to what JUL argues, however, the proper remedy is not to strike ACF's brief in its entirety. Parts of that brief do address the issues of which JUL had timely and adequate notice. In some circumstances, the Board has permitted a party to remedy a notice problem by giving the opposing party an opportunity to address the new issues. That remedy also is not appropriate here, for several reasons. In the August teleconference, ACF also agreed that the framework for the issues did not encompass all

16

of the facts that ACF now alleges. Moreover, permitting ACF to amend its bases for the
suspension now would delay a hearing on the suspension and be contrary to Board and
ACF policy to hear these cases expeditiously. Thus, the appropriate remedy in this case
is for the Board to simply treat any allegations raised for the first time in ACF's brief as
outside the scope of the hearing.

## VIII.  Ruling on Summary Judgment

### A.    The Standard for Summary Judgment

Head Start grantees are entitled under the regulations to an evidentiary hearing to contest
the basis for ACF's termination decision (or decision to deny refunding or suspend a
grant for more than 30 days). *See* 45 C.F.R. § 1303.16. The Board has held, however,
that it may grant summary judgment in a Head Start termination case, under appropriate
circumstances, without violating a grantee's right to a hearing. *See, e.g., Camden County
Council on Economic Opportunity,* DAB No. 2116, at 3 (2007) *(Camden); Philadelphia
Housing Authority,* DAB No. 1977, at 7 (2005), *aff'd, Philadelphia Housing Auth. v.
Leavitt,* No. 05-2390, 2006 WL 2990391 (E.D.Pa. Oct. 17, 2006). Similarly, in several
suspension cases, the Board has entered summary judgment against a Head Start grantee
after ordering the grantee to show cause why the Board should not summarily uphold
ACF's determination. *See Head Start Board of Directors,* DAB No. 2148 (2008), and
*The Connector (Making the Connection), Inc.,* DAB No. 2191 (2008).

The Board has stated that "[s]ummary judgment is appropriate when there is no genuine
dispute as to any material fact, and the moving party is entitled to judgment as a matter of
law." *Camden* at 4, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986). The
party moving for summary judgment bears the initial burden of demonstrating that there
are no genuine issues of material fact for trial and that it is entitled to judgment as a
matter of law. *Celotex,* 477 U.S. at 323. If a moving party carries its initial burden, the
non-moving party must "come forward with 'specific facts showing that there is a
genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574,
587 (1986). While the Board has found that summary judgment may be appropriate in
Head Start cases, the Board has also stated that it may take other considerations into
account in determining whether to grant summary judgment to ACF, such as whether a
hearing would aid the Board in deciding the case. *Dallas-Selma Community Action
Agency and Community Development Corp.,* Docket No. A-07-108, Ruling on Motion for
Summary Disposition dated April 25, 2008, at 5 ("the Board's procedures . . . permit it to
deny a motion for summary disposition where it determines that its decisionmaking
would be enhanced by the presentation of testimony in the context of an evidentiary
hearing"); 45 C.F.R. § 16.11(a).

17

In determining whether summary judgment in ACF's favor is appropriate, we must examine whether ACF met its initial burden of demonstrating that there are no genuine issues of fact material to the Board's resolution of the identified issues and that ACF is entitled to judgment on the suspension as a matter of law. Only if ACF met that initial burden would the Board need to address whether JUL came forward with specific facts showing that there is a genuine issue for hearing.

### B.     ACF's Motion for Summary Judgment

In its response brief, ACF said that it was submitting a "motion for summary judgment on the issue of JUL's failure to establish, develop, and implement a follow-up plan for children under its care with observable, known or suspected health or developmental problems." ACF Response Br. at 1. At the beginning of the argument section of the brief, ACF makes the following more general and ambiguous statement:

> JUL has not shown that it had an effective system for ensuring children in its care were properly supervised and not inappropriately disciplined. ACF properly suspended JUL's grant in April 2013. Additionally, ACF properly continued the suspension in light of JUL's failure to ensure that its Head Start centers were properly maintained. Finally, JUL admitted that it did not provide follow up health plans for children; and admitted that three of its centers should not be used for the 2013-2014 school year. ACF is entitled to summary judgment on these violations of federal law.

*Id.* at 15.[5]  Despite this statement (and the fact that the first two sections of ACF's argument identify some alleged admissions by JUL regarding matters on which ACF relied to support the summary suspension), ACF's brief does not mention summary judgment again until the third and last part of its argument. In that part, under the heading "ACF is entitled to summary judgment because JUL admits it did not provide individual health plans," ACF first sets out the standard for summary judgment and cites several Board decisions granting summary judgment in Head Start cases. *Id.* at 24-25.

In particular, ACF relies on the Board's decision in *Union Township Community Action Organization, Inc.,* DAB 1976 (2005). In that Head Start termination case, the Board indicated that, to the extent compliance with Head Start performance requirements can be established only through documentary evidence, a genuine dispute of fact is present only when the appellant has produced that documentation (absent an allegation that the

---

[5]  ACF also describes the list of Head Start requirements from the summary of the August 2, 2013 teleconference as a list of "deficiencies" on which ACF relied to support the suspension. *Id.* In fact, ACF agreed to the list as setting out the "requirements which the grantee is alleged to have violated" for purposes of identifying those requirements in the notice of hearing pursuant to 45 C.F.R. § 1303.16(h). Under the Head Start statute and regulations, not all violations of the requirements meet the definition of "deficiency."

18

documentation is not available because of circumstances beyond the grantee's control).
Otherwise, the absence of any supporting documentation may be the basis for summary
judgment adverse to an appellant because, pursuant to 45 C.F.R. § 1303.14(d)(4), an
appellant is required to submit "copies of each document the grantee believes is relevant
and supportive of its position."

ACF points out that section 1304.20(a)(1)(iv) of the Head Start performance standards
requires grantees to develop and implement a "follow-up plan" so that any needed
treatment has begun for any condition identified either through the screening required
under paragraph (ii) of that section or through the further diagnostic testing, examination,
and treatment for a child with an observable, known, or suspected health problem that the
grantee is required to obtain or arrange under paragraph (iii).

To support its position that there is no dispute of material fact regarding whether JUL met
this requirement, ACF points to the Corrective Action Plan (CAP) that JUL submitted on
August 7, 2013 in response to ACF's Notice of Deficiency Requiring Immediate
Correction dated July 8, 2013.[6] That notice informed JUL that ACF had determined,
among other things that JUL was deficient in meeting the requirements of section
1304.20(a)(1)(iv). ACF Ex. 89. ACF said its determination of a deficiency was based on
information from the reviews ACF conducted on April 16 and the week of May 21, 2013
and on information CDI provided to ACF. *Id.* at 1. The attached report identified a
deficiency in JUL's Head Start Program in meeting the requirements of section
1304.20(a)(1)(iv), based on ACF's finding that "[c]hildren with known health conditions
were missing Individual Health Plans (IHPs), and, as a result, staff were not aware of
children with allergies and other conditions." *Id.* at 8. Specifically, ACF reported the
following:

> A review of child files at the Fairfield, Kennedy, R.L. Wilson, Normandy, and
> Shands Centers found 27 files of children with known health conditions did not
> contain written health plans. Thirteen of the 27 children had asthma and required
> medication; 1 child had seizures; and the remaining 13 children had drug or
> environmental allergies. A review of tracking documents for the Anders Park,
> Bridge, Grant Memorial, Happyland, Little Angels, Mt. Zion, Shands, Baldwin,
> Pearson Early Head Start (EHS), Grunthal EHS, Hilltop, Old Stanton, Moncrief,
> Lee Road, R.F. Kennedy, 8th Street, South Wind Villas, N.E. Springfield,
> Normandy, and Fairfield Centers found a total of 180 children with identified
> health conditions—including chronic health issues, severe allergies, and needs for
> special diets – did not have IHPs.

---

[6] This CAP is different from the CAP JUL submitted in response to the report of the Triennial Review.

19

... The grantee did not develop and implement follow-up health plans for
children with observable, known, or suspected health conditions so needed
treatment began; therefore, it was not in compliance with the regulation.

*Id.*

ACF asserts in support of its motion for summary judgment that JUL in its CAP admits
that 180 children with identified health conditions did not have follow-up health plans.
ACF Response Br. at 27. ACF also cites the CAP as showing that "JUL does not deny
that the lack of follow up health plans posed a serious risk to the health and safety of its
participants." *Id.* According to ACF, the "only mention of health plans in [JUL's] initial
brief is at number seventeen in its list of thirty-three 'material facts in dispute' as to
'whether children with serious health conditions did not have 'Individualized Health Care
Plans.'" *Id.* ACF also cites to *Union Township*, arguing that "JUL does not offer any
evidence that it had developed and implemented individual follow-up health plans for
each of the children with observable, known or suspected health or developmental
problems." *Id.*

ACF also cites to its Exhibits 18, 82, 17, and 81 to support its assertions that—

- when CDI was substituted for JUL in April 2013 and three children experienced
  difficulty breathing, CDI's "only possible recourse was to call 911 and hope that
  the children received medical treatment in time";
- CDI then discovered JUL "did not have adequate follow-up health plans in place
  for every child with health problems';
- CDI then put together lists of identified health concerns in order to protect the
  children;
- CDI identified over 100 children that "needed follow up health plans, with asthma
  being the most common concern";
- since asthma can be life-threatening, "it is vital to avoid things that can trigger an
  attack and to administer prescribed medicine" and since "JUL employees were not
  trained on how to respond through follow up plans, JUL placed these children in
  serious danger";
- JUL "does not dispute that many of its direct care providers and teachers were
  unaware of some of the children with chronic allergies in their classrooms which
  put the children at grave risk,"
- while JUL alleges that "children with allergies names were posted in both the
  kitchen and classroom," JUL "has never provided any evidence to ACF that it had
  lists of names of children with allergies," and, in any event, "such lists without
  accompanying follow-up health plans would be ineffective, because it would not
  indicate what specific interventions (including medications) were necessary if
  children were experiencing symptoms"; and

20

- "the majority of JUL staff was not trained to administer medication or to appropriately respond if a child with a chronic health condition experienced symptoms," and JUL had made no specific plans to train its employees on developing and implementing follow-up health plans, as evidenced by the Training Program for 2013-2014.

*Id.* at 27-28. ACF also refers to JUL's deficient practices of "leaving children with severe allergies to self-administer epinephrine ('EpiPens') by storing them in their backpacks and making the determination themselves if they were experiencing anaphylactic shock"; of not ensuring that if a child needed them, staff could access the pens quickly; and of failing to take steps to ensure that children did not have access to the medications. *Id.* at 29.

ACF concludes:

> Because JUL does not dispute that it did not determine the children's health status expeditiously in order to meet their medical and developmental needs by establishing and implementing follow-up plans in accordance with 45 C.F.R. § 1304.20(a)(1)(iv), summary judgment is appropriate.

*Id.*

## C.   Analysis

We conclude that ACF's motion is insufficient to meet its burden as the moving party to demonstrate that it is entitled to judgment as a matter of law, for the following reasons.

First, while ACF's brief generally identifies some incidents that were the basis for the summary suspension which ACF says JUL does not dispute occurred, ACF does not in moving for summary judgment assert either that no dispute of fact raised by JUL is material to the Board's resolution of the issues presented or that any dispute regarding a material fact (other than the lack of IHPs) is not genuine. ACF fails to even acknowledge the overarching issues to which the parties had previously agreed, much less to assert that the Board does not need to reach each of those issues in order to uphold the suspension. Instead, the part of ACF's brief addressing summary judgment relies narrowly on only one alleged deficiency, with respect to which ACF says that JUL did not submit the documents (IHPs) the on-site review found to be missing and that JUL's CAP constitutes an admission that its failure presented a serious risk to the children's health and safety.

While ACF's brief does contain the more general statement, quoted above, regarding summary judgment, the only facts that general statement identifies as undisputed (i.e., admitted) are that JUL did not provide follow-up health plans for children and that three of its centers should not be used for the 2013-2014 school year. That statement is too

21

vague and ambiguous to meet ACF's burden and to support summary judgment. Moreover, with respect to the grounds ACF gave for the summary suspension, the statement avers only that "JUL has not shown that it had an effective system for ensuring children in its care were properly supervised and not inappropriately disciplined." ACF Br. at 15. ACF does not aver that JUL raised no dispute of fact material to whether JUL had such a system.

Second, neither the Notice of Summary Suspension nor the notice continuing the suspension alleged broadly that JUL "did not determine the children's health status expeditiously in order to meet their medical and developmental needs by establishing and implementing follow-up plans in accordance with 45 C.F.R. § 1304.20(a)(1)(iv)."

In the June 2013 notice continuing the suspension, ACF asserted that CDI and ACF had "discovered other dangerous conditions at JUL when CDI became the interim grantee," describing those conditions generally as follows:

> The facilities were in disrepair, there were infestations of mold, rats and insects, the learning environments were crowded, dirty, poorly lighted and children with serious health conditions had no Individual Health Care Plans.

Notice of Summary Suspension at 4. ACF's Notice of Summary Suspension contains no mention of IHPs as a basis for the summary suspension. Despite the fact that IHPs were not mentioned in the Notice of Summary Suspension and provided only one of many additional reasons why ACF decided to continue the suspension, ACF's brief provides no rationale for a conclusion that the **only** material facts are those related to IHPs.

Moreover, even if we read ACF's brief as asking only for partial summary judgment on the more narrow issues of whether JUL lacked IHPs for some children with serious health conditions and that that failure violated section 1304.20(a)(1)(iv), we would deny that request. ACF's brief does not explain its basis for saying that section 1304.20(a)(1)(iv) requires Head Start grantees to have IHPs. That section requires a Head Start grantee to "[d]evelop and implement a follow-up plan for any condition identified in 45 CFR 1304.20(a)(1)(ii) and (iii) so that any needed treatment has begun," but does not itself provide that the only form a follow-up plan can take is an IHP. ACF's reliance on *Union Township* is misplaced because that case involved a different performance standard and the grantee's own policy called for IHPs. Although *First State* discussed a grantee's failure to correct a deficiency in meeting the requirements of section 1304.20(a)(1)(iv) because some children did not have IHPs, in that case the grantee had specifically provided in its CAP that the method it would use to meet the requirement was by developing IHPs. DAB No. 1877, at 26, 28-29. That case also discusses a tracking system that enables a grantee to follow up to ensure that any needed treatment has begun for children with identified conditions.

22

Moreover, ACF does not specifically explain how its findings regarding children with EpiPens relate to the wording of section 1304.20(a)(1)(iv). ACF cited a different regulatory section (1304.22(c)(6)) with respect to these findings in its July 2013 notice informing JUL it had deficiencies it needed to correct. July 8, 2013 Notice of Deficiency Requiring Immediate Correction at 8-9. Indeed, in the August 2 teleconference when ACF mentioned the EpiPens, JUL objected on notice grounds, and ACF agreed to retract section 1304.22 from the list of requirements at issue.

In addition, JUL's statements in the CAP based on which ACF says that JUL effectively admitted a deficiency in meeting the requirement at 1304.20(a)(1)(iv) that placed the children's health and safety at serious risk are not as clearly an admission to that effect as ACF represents. The purpose of a CAP is not to identify any disputes with respect to review findings and conclusions, but is to identify what steps the grantee will take to correct any deficiency or noncompliance identified in a review. The CAP identified the following as the corrective actions JUL would take in response to the review finding that "[c]hildren with known health conditions were missing Individual Health Plans (IHPs) and as a result, staff were not aware of children with allergies and other conditions":

> We will implement the development of follow-up health plans for children with observable, known or suspected health conditions. We admit that we did not know this was mandatory. None of our previous on-site visits by regional staff or our triennial reviews sited (sic) this either as a recommendation or non-compliance. Our practice continues to post the first names of children on the classroom walls that have allergies. Therefore it is difficult to provide any other explanation.

ACF Ex. 11, at 14-15.

Another related review finding was that "one teacher stated the kitchen staff were aware of allergies, so teaching staff did not need to be aware since kitchen staff would prepare proper foods and make needed substitutions" and "[a]s a result, there was no way for teaching staff to know whether any child was allergic to a food item should kitchen staff not make a needed substitution putting such children at risk for allergic reactions," and that a second teacher stated that two children in her class had EpiPens stored in their backpacks and would self-administer their medication if necessary, and there were "no IHPs for the two children." *Id.* at 14. JUL's identified corrective action in the CAP was:

> Children with allergies names are posted both in the kitchen and classroom. This has always been our practice. Therefore, it is again, difficult to provide any explanation, except failed (sic) to monitor adequately by supervisor staff associated with the oversight of our classroom operations.

23

*Id.* These responses at least raise an issue regarding awareness of staff of children's allergies and any concomitant risk. Moreover, read in the light most favorable to it, JUL's response could be read as meaning that it did not know that IHPs were mandatory and that it did take steps to reduce the risks to children with allergies.

Even if the CAP is read as an admission that JUL should have had IHPs for some children with identified health conditions but did not, however, we would deny partial summary judgment on this issue. Given the nature of the issue, we determine that the Board's decision making with respect to JUL's compliance with section 1304.20(a)(1)(iv) would be enhanced by the presentation of related testimony in the context of an evidentiary hearing.

**Conclusion**

For the reasons stated above, we conclude that JUL's objection to the issues statement has no merit; we deny JUL's motion to strike ACF's brief; and we deny ACF's motion for summary judgment on the suspension.

Leslie A. Sussan

Constance B. Tobias

Judith A. Ballard
Presiding Board Member